## Commonwealth *vs.* Timothy L. Zanetti.

Worcester. November 6, 2008. - August 3, 2009.

Present: Marshall, C.J., Ireland, Spina, Cowin, Cordy, Botsford, & Gants, JJ.

*Homicide. Evidence,* Joint venturer. *Joint Enterprise. Practice, Criminal,* Required finding, Instructions to jury, Jury and jurors, Double jeopardy, Capital case. *Accessory and Principal. Jury and Jurors. Words,* "Aiding and abetting."

At a murder trial where the Commonwealth proceeded against the defendant on a theory of deliberate premeditation based on both principal and joint venture liability, the judge erred in denying the defendant's motion for a required finding of not guilty after the jury found the defendant guilty as a joint venturer, where there was no evidence that would reasonably permit the jury to find beyond a reasonable doubt, either directly or through inference, the necessary evidence of shared intent for murder, of knowledge on the defendant's part that the alleged shooter had a gun, or of the defendant's agreement to help [454-459]; however, where the Commonwealth presented sufficient evidence to support the defendant's conviction based on principal liability, and where this court, from the record before it, could not infer that the jury had unanimously acquitted the defendant on that theory, the Commonwealth was not precluded from retrying the defendant solely as a principal [459-461].

This court concluded that, with regard to jury instructions on joint venture, when there is evidence that more than one person may have participated in the commission of the crime, judges in the future should simply instruct the jury that the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense. [461-469] Cowin, J., dissenting.

Discussion of issues likely to arise on the retrial of a criminal case. [469]

Indictment found and returned in the Superior Court Department on October 12, 2004.

The case was tried before *Timothy S. Hillman,* J.

*Stephen Paul Maidman* for the defendant.

*Michelle R. King,* Assistant District Attorney, for the Commonwealth.

Gants, J. Shortly before midnight on July 15, 2004, Hector

Rivera was shot and killed while driving on Main Street in Worcester. The fatal bullet was fired from an automobile in which the defendant was a passenger. The defendant was indicted on a charge of murder in the first degree, and at a jury trial, the Commonwealth proceeded against him on the theory of deliberate premeditation based on both principal and joint venture liability. The jury convicted the defendant of murder in the first degree as a joint venturer. On appeal, the defendant primarily argues that his motion for a required finding of not guilty should have been granted because there was insufficient evidence that he deliberately premeditated the murder as part of a joint venture. We agree and reverse the defendant's conviction. We conclude, however, that the Commonwealth presented sufficient evidence to support the defendant's conviction based on principal liability and is not precluded from retrying the defendant solely as a principal. Accordingly, we remand the case for a new trial.

Toward the end of this opinion, we address the traditional jury instruction on joint venture and conclude that our law on joint venture will be better understood, and ultimately more fair and just, if in the future judges simply instruct juries in appropriate cases that a defendant is guilty of a crime if he knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that crime. See Appendix. We also discuss the practical consequences of this shift from the language of joint venture to the language of aiding and abetting.

1. *Background.* We summarize the Commonwealth's evidence in the light most favorable to it, paying particular attention to the evidence of joint venture.[1]

At approximately 11:45 P.M. on the night of the shooting, the defendant and Jorge Lopez separately left the Club Octaine in Worcester. Each asked Fuquan Toney for a ride in the automobile Toney was driving, and Toney agreed. In the automobile were Toney, in the driver's seat; Michael Faison, in the front passenger seat; Lopez, in the back left seat behind the driver; and the defendant, in the back right seat behind Faison. All four occupants of the automobile were members of a gang called the

---

[1] The defendant did not call any witnesses or introduce any exhibits during the trial.

Vice Lords. Lopez and Toney were half-brothers, and had grown up together. Toney and Faison were close friends. The defendant had been a member of the Vice Lords for less than two months. According to Lopez, a new member could move faster in the gang by "fighting and stuff like that, like just getting a reputation for yourself."

Shortly before midnight, Toney's automobile stopped at a traffic light at the intersection of Main and Pleasant Streets in Worcester. Toney's automobile was in the left lane. An automobile driven by Hector Rivera, the victim, stopped in the right lane next to Toney's automobile. The victim was alone in his automobile. Lopez had known the victim for a couple of years, and knew he associated with another gang. As the two drivers waited for the light to change, an argument began between the occupants of Toney's automobile and the victim, apparently initiated by someone — it is not clear from which automobile — saying, "What the fuck are you looking at?"

While the two cars were still stopped at the light, an automobile driven by Holly Dusoe, with Cheryl Mazzuchelli in the front passenger seat, stopped directly behind the victim's automobile. Dusoe and Mazzuchelli were nurses who were driving home together from their work at the University of Massachusetts Memorial Medical Center. It appeared to Dusoe that "everybody" in Toney's automobile was "[verbally] fighting with" the victim; she "heard fighting," but she could not make out any words. At one point, however, she saw the victim moving and gesturing with his arms as if he "was pleading his case." She also saw the two rear passengers in Toney's car nervously looking back and forth, left to right. Dusoe testified that the person sitting in the front passenger seat of Toney's automobile was wearing a white windbreaker (Faison), the person in the back seat on the driver's side had long hair with beads in it (Lopez), and the person in the back seat on the passenger side was light-skinned with short, dirty blond hair (the defendant).[2] Dusoe was unable to describe the driver.

Shortly after the light turned green, the victim's automobile moved slowly through the intersection.[3] Dusoe and Mazzuchelli

---

[2] There was uncontroverted evidence that the defendant was white, and wore a blue, long-sleeved "Phat Farm" shirt.

[3] Holly Dusoe estimated that the cars were stopped at the light for three to

provided different accounts of what happened next. According to Dusoe, the victim's car moved into the left lane, ahead of Toney's car, and Toney's car then drove around to the right, so that the victim's car was on its left. Dusoe saw someone wearing a white windbreaker (Faison) extend his arm out of the front passenger side window, reach around to the left, and fire two shots at the victim's car. Dusoe saw this person holding a silver gun, which may have been a revolver. After the shots, Toney's car kept driving ahead, while Dusoe stopped and telephoned the police.

According to Mazzuchelli, when the two cars ahead of them began to move after the light turned green, she saw the victim's car drift into the left lane, close enough to Toney's car that she feared there might be a collision. She heard one gunshot, and saw Toney's car move into the oncoming traffic lane (i.e., a little farther to the left), perhaps at the same time. The victim's car came to rest, and Dusoe stopped her car. When Mazzuchelli ran back to the victim's car to help him, she observed blood coming from the left side of his head.

The Commonwealth introduced a statement that the defendant had given to the police after receiving Miranda warnings,[4] and called Lopez and Faison as witnesses. The three men presented conflicting accounts of events that took place inside Toney's car at the time of the shooting. The defendant claimed in his statement that only he, Lopez, and Toney were in the car; he did not mention Faison or any fourth occupant. According to the defendant, he sat in the front passenger seat, with Lopez behind him in the back right seat. The defendant surmised that Toney knew the victim, because Toney and the victim started arguing. The defendant saw the victim reach for something, and shouted that the victim had a gun. The defendant ducked down and heard a shot. After hearing the shot, the defendant saw Lopez pass a gun inside a sock to Toney.[5] Toney kept driving for several blocks,

---

five minutes. Our review of security camera footage presented by the Commonwealth suggests that the two cars were stopped next to each other for a total of approximately ten seconds.

[4] The statement was not recorded, but was transcribed by a police detective and then read to the defendant, who signed it and initialed each page.

[5] According to Jorge Lopez, and to a Commonwealth expert, the purpose of keeping a gun inside a sock is to prevent cartridge casings from falling and being left at the scene of a crime.

then gave the gun to the defendant and instructed him to get out of the car and dispose of it. The defendant told police he then got out of the car and concealed the gun under a dumpster. The gun was never found.

Lopez testified to very different facts. He stated that, when Toney's car stopped at the intersection, he (Lopez) was sitting in the back left seat, with the defendant to his right, and Toney and Faison in the front two seats. Lopez glanced up when he heard the argument with the victim at the intersection and saw the defendant take a gun wrapped in a sock from his pants. After the cars began to move, the victim's car swerved to the left toward Toney's, and Lopez saw the defendant cock the gun and shoot the victim. Lopez testified that the gun was out for ten to fifteen seconds before it was fired. Lopez further testified that he did not know the identity of the victim at the time of the shooting, because the victim's car was slightly ahead of Toney's car when stopped at the intersection and his view of the victim's car was blocked by the front passenger seat.[6] Lopez also testified that the shooting resulted from a simple traffic argument and was unrelated to gang membership or an ongoing quarrel. According to Lopez, after the gun was fired, he asked the defendant, "Did you just shoot that kid?" The defendant did not respond. At some point thereafter, Toney stopped the car, and the occupants of the car "kicked [the defendant] out."

Faison testified simply that he had been seated in the front passenger side of the car, but that he had been too drunk to remember any of the events of the evening.[7]

The victim was taken to a hospital and died shortly after midnight. A medical examiner for the Commonwealth testified that the victim had been shot once in the left side of the head, directly behind the ear.

In the course of the police investigation, all four occupants of

---

[6]Security camera footage, however, showed that the victim's car had been further back than Fuquan Toney's car at the traffic light, placing the victim parallel to, or a little behind, Lopez.

[7]On cross-examination, Michael Faison admitted that he had never returned to work after the night of the shooting, and that approximately two weeks later he had violated his probation to move out of the State. James Evans, who gave both Faison and Toney spare shirts when they came to his house shortly after the shooting, testified that neither was drunk.

Toney's car were arrested. When the police arrested Toney seven days after the murder, they seized, among other items, a box of ammunition from Toney's apartment. When Lopez was arrested (on the same day as Toney), the police seized a loaded handgun, "crack" cocaine, and some cash from Lopez's apartment. A firearms expert testified that the revolver taken from Lopez could not have fired the fatal projectile, nor could that projectile have been fired from any weapon designed for the ammunition seized from Toney.

2. *Discussion.* a. *Sufficiency of the evidence.* The Commonwealth proceeded at trial on the theory that the defendant was guilty of murder in the first degree by deliberate premeditation as the shooter, or, alternatively, guilty of that crime as a joint venturer. The judge presented both alternatives to the jury in his instructions. The judge further instructed the jury that, if they found the defendant guilty, they were to specify whether they found him guilty as a principal or as a joint venturer, but they could not find him guilty both as a principal and as a joint venturer. The jury verdict slip was written so that the jury could make this choice. As has been stated, the jury found the defendant guilty as a joint venturer.

The defendant argues that the evidence is not sufficient to support this verdict. He moved for a required finding of not guilty at the close of the Commonwealth's evidence and renewed the motion at the conclusion of the evidence. He objected to the judge's providing instructions to the jury on the law of joint venture, and he challenged the sufficiency of the Commonwealth's joint venture evidence in a motion under Mass. R. Crim. P. 25 (b) (2), 378 Mass. 896 (1979), after trial. The claim of error was preserved. See *Commonwealth* v. *Fickett*, 403 Mass. 194, 197 (1988).

"In reviewing the denial of a motion for a required finding of not guilty, we must determine whether the evidence, including inferences that are not too remote according to the usual course of events, read in the light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt." *Commonwealth* v. *Nolin*, 448 Mass. 207, 215 (2007). "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the

persuasion of [guilt] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928).

If the jury had found the defendant guilty of deliberately premeditated murder as a principal, there was sufficient evidence, mostly through Lopez's testimony, that the defendant was the person who fired the fatal shot at the victim and that he did so with deliberate premeditation and the intent to kill. However, the jury found the defendant guilty as a joint venturer, which under the judge's instructions required the jury to find that the defendant acted in concert with others in the commission of the killing. If the defendant was not the shooter, the evidence was not sufficient to support the jury's finding that the defendant participated in a joint venture with the shooter to commit the killing.

To succeed on a theory of deliberately premeditated murder as a joint venturer under our present articulation of the law, the Commonwealth was required to prove that the defendant was "(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement, [was] willing and available to help the other if necessary." *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995), quoting *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988). The Commonwealth also needed to prove the defendant shared the mental state or intent for deliberately premeditated murder, which is malice, and, in particular, an intent to kill. See *Commonwealth* v. *Jenks*, 426 Mass. 582, 585 (1998). In addition, the Commonwealth needed to prove deliberate premeditation, "that the defendant's decision to kill was the product of 'cool reflection.' " *Commonwealth* v. *Freeman*, 442 Mass. 779, 783 (2004), quoting *Commonwealth* v. *Williams*, 422 Mass. 111, 122 (1996). We have also stated that "[u]nder a theory of joint venture premeditated murder during which another person carried and used the gun, the Commonwealth must 'establish beyond a reasonable doubt that the defendant knew [the other person] had a gun with him.' " *Commonwealth* v. *Green, supra*, quoting *Commonwealth* v. *Lydon*, 413 Mass. 309, 312 n.2 (1992). Accord *Commonwealth* v. *Phillips*, 452 Mass. 617, 631 (2008).[8]

Here, the evidence was uncontroverted that one of the four

[8]The joint venture instruction in this case failed to inform the jury of the

persons in the car driven by Toney had shot and killed the victim, and that the defendant was a passenger in the car at the time. Thus, the first element of our traditional expression of a joint venture theory of guilt was made out: the defendant was present at the scene of the crime. There was also sufficient evidence that another person, besides the defendant, could have been the shooter. See *Commonwealth* v. *Gonzalez*, 443 Mass. 799, 806 (2005); *Commonwealth* v. *Green*, *supra*. The jury reasonably could have inferred that Lopez fired the fatal shot, because the defendant in his statement to the police stated he heard a shot and then saw Lopez pass a gun wrapped in a sock from the back of the car to Toney in the front.[9] The failure of proof of joint venture in this case is that, if the jury did conclude that Lopez was the person who actually fired the gun, there is no evidence that would reasonably permit the jury also to find beyond a reasonable doubt, by direct evidence or inference, that before Lopez fired the gun, the defendant (1) knew that Lopez had the weapon and was intending to kill the victim with it; (2) shared Lopez's intent; and (3) by agreement was ready and willing to help.

The Commonwealth points to evidence that all four persons in Toney's car were involved in an argument with the victim; the defendant and Lopez were nervous and looking back and forth; and the victim appeared to be pleading his case. The Commonwealth then argues that, viewed together, this evidence permits an inference that someone in Toney's car displayed a gun to the victim while they were all still stopped at the light, which would in turn imply knowledge of the weapon on the part of everyone in Toney's car before the shot was fired. The Commonwealth also claims that the jury could infer "that the defendant knew that other occupants in his car had a gun and was alerting the shooter so he could fire at [the victim]" from the defendant's statement that he thought the victim was reaching for a gun and yelled, "He has a gun," while ducking down.

requirement that the Commonwealth prove the defendant's knowledge that someone in Toney's car had a gun.

[9]There was also testimony from Dusoe that someone sitting in the front passenger seat wearing a white windbreaker (Faison) extended his arm out of the car and fired two shots in the direction of the victim's car. However, for reasons discussed above, we conclude that the jury would not be warranted in finding that Faison actually fired the fatal shot.

We disagree that either proposed inference is fair or reasonable, and thus sufficient to support a finding of guilt beyond a reasonable doubt. The jury at the very least would have had to engage in unwarranted guesswork about what the occupants of Toney's car, and the victim, were actually doing and saying before the defendant screamed that the victim had a gun. The record is bereft of evidence to support the hypothesis that anyone in Toney's car other than the defendant had displayed a gun to the other occupants for a sufficient time to allow the others to appreciate its presence — especially when Dusoe, who saw the victim's gesturing and was carefully observing the occupants of both cars, did not indicate she saw anything to support such a hypothesis. If the defendant was the shooter, there was no evidence that anyone else in the car knew that he intended to kill the victim, shared his intent, or by agreement was ready and willing to help. If he was not the shooter, it would require a leap into conjecture for the jury to conclude from the defendant's ducking and yelling, "He has a gun," that the defendant knew one or more of his driving companions had a gun and was warning or alerting them to use it.

The Commonwealth alternatively argues that the necessary evidence of shared intent for murder, of knowledge of the gun on the defendant's part, and of agreement to help may be found by combining the testimony of Lopez and Dusoe. The Commonwealth contends that, if the jury had believed certain pieces of the testimony offered by Lopez and Dusoe and had rejected other related pieces of each witness's testimony, they would have been able to find that the defendant took a gun out of his waistband (as Lopez stated), and that Faison (in the front passenger seat and wearing a white windbreaker) had reached his arm out the open passenger side window and shot the victim (as Dusoe testified). Under this view of the evidence, the defendant knew of the gun's presence, because he pulled it from his waistband, and the jury could reasonably infer that the defendant passed the gun to Faison with the intent that Faison use the gun to shoot the victim.

Jurors, of course, are free to believe or disbelieve the testimony of each witness in whole or in part. See *Commonwealth v. Hawkesworth*, 405 Mass. 664, 674-675 (1989); *Commonwealth*

v. *Zane Z.*, 51 Mass. App. Ct. 135, 140 (2001). At the same time, however, "a jury cannot properly be permitted to wrest part from a clear and consistent context so as to attribute to a witness a statement which he did not make." *Commonwealth* v. *McInerney*, 373 Mass. 136, 144 (1977), quoting *Lowell* v. *Boston Storage Warehouse Co.*, 280 Mass. 234, 237 (1932). In accordance with these principles, the jury here permissibly could accept Lopez's testimony that the defendant, sitting in the back passenger seat of Toney's vehicle, removed a gun from his pants and held it up, and reject Lopez's further statement that he saw the defendant cock the gun and shoot it at the victim. The jury could not, however, permissibly accept Dusoe's testimony that the victim's car was to the left of Toney's car when she saw the person with the white windbreaker stick his hand out of the right passenger window of Toney's car, bend his hand, and shoot to the left toward the victim's car. It is undisputed that the victim was shot once on the *left* side of his head. It follows that the only reasonable conclusion the jury could have reached is that the shooter fired the fatal shot from a position to the left of the victim's car. The jury could disbelieve Dusoe that the victim's car was to the left of Toney's car at the time the shots were fired, because Mazzuchelli and Lopez both testified that the victim's car remained to the right of Toney's vehicle at all relevant times. However, the jury could *not* permissibly conclude that Dusoe saw the passenger extend his hand out the window and shoot at the victim in a car to the right of Toney's car, because Dusoe testified to the opposite. See *Commonwealth* v. *Perez*, 390 Mass. 308, 314 (1983) ("jury's right to selective credibility does not permit [them] to distort or mutilate any integral portion of the testimony to permit them to believe an unfounded hypothesis"). See also *Commonwealth* v. *Daughtry*, 417 Mass. 136, 140 n.1 (1994) ("jury are free to believe part of a witness's testimony and disbelieve part, if doing so does not distort any integral portion of the testimony"). As a result, Dusoe's testimony cannot support a jury finding that Faison (the person in the white windbreaker) fired the fatal shot.[10]

---

[10]Presumably it is for this reason that the prosecutor argued to the jury in his closing that the way to understand Dusoe's testimony was to accept that any shots she may have witnessed were separate from and did not include the shot that killed the victim.

Without Dusoe's testimony, there was no evidence that would permit a finding that the defendant introduced the gun, but was not the person who fired the shot that killed the victim. See *Commonwealth* v. *Green*, 420 Mass. 771, 779-781 (1995). See also *Commonwealth* v. *Berry*, 431 Mass. 326, 332-334 (2000). Cf. *Commonwealth* v. *Fickett*, 403 Mass. 194, 196, 198-199 (1988) (insufficient evidence of defendant's guilt of deliberately premeditated murder as joint venturer where defendant and co-venturer agreed to commit robbery, but each testified that other, acting alone, had later killed victim).[11]

We conclude that the defendant's motion for a required finding of not guilty as to joint venture liability should have been allowed. As a consequence, the verdict in this case must be set aside.

b. *Retrial on principal liability.* The defendant argues that, because the jury convicted him on joint venture liability, the verdict amounted to an acquittal on principal liability, and that double jeopardy principles bar retrial on that theory. See G. L. c. 263, § 7. We disagree.

The judge submitted a specific verdict slip to the jury, allowing them to choose from the following options by marking the appropriate space beside each option: (1) "Not Guilty"; (2) "Guilty — Murder, First Degree," and, indented and underneath, the choices of (a) "Theory of Deliberate Premeditation (Principal)," and (b) "Theory of Deliberate Premeditation (Joint Venture)"; (3) "Guilty — Murder, Second Degree (Principal)"; and (4) "Guilty — Murder, Second Degree (Joint Venture)." In explaining the verdict slip to the jury, the judge stated:

"[I]n murder in the first degree, you have the theory of

---

[11]The Commonwealth also contends that the evidence that "all the occupants of [Toney's] car fled together . . . and the defendant then left the car alone and hid the gun" supplies additional, important proof that all in the car, including the defendant, were part of a joint venture. This contention fails. The fact that, immediately after the shooting, Toney drove away with all his passengers still in the car says nothing about whether, before and at the time of the shooting, the defendant and one or more of the car's occupants shared the intent to kill the victim and by agreement were ready and willing to help each other in committing the crime. The same is true of the defendant's departure from the vehicle with the gun after the victim was shot. This evidence may suggest liability as an accessory after the fact, but it is not probative of the defendant's or anyone else's mental state or actions before the shooting took place.

deliberate premeditation with the defendant as the principal actor and the theory of deliberate premeditation with the defendant as a joint venturer. . . .

"Now, before you can convict the defendant of murder in the first degree or murder in the second degree, you must be unanimous as to the theory under which you are finding him guilty. You may not convict the defendant under more than one theory, and all twelve of you must agree on the theory under which you find him guilty.

"Now, simply stated, in order to achieve a verdict, you need a unanimous vote of twelve jurors. And that means you only need to make one check on the verdict form. You only have one choice. Okay?"

The jury checked off the box beside the words, "Guilty — Murder, First Degree," and then checked the indented box beside the words, "Theory of Deliberate Premeditation (Joint Venture)." The defendant claims that based on the judge's direction to choose only one theory of guilt, the verdict shows that the jury affirmatively rejected the theory that the defendant was the principal actor, thereby in substance acquitting him of murder under that theory.

We will not infer acquittal from silence on a verdict slip "unless a conviction of one crime logically excludes guilt of another crime"; if it is possible that the jury were split as to the crime for which they gave no indication, double jeopardy does not bar retrial on that theory. *Commonwealth* v. *Carlino*, 449 Mass. 71, 78-80 (2007). Here, all that may be concluded from the verdict slip is that the jury did not unanimously find the defendant to be the shooter. His conviction as a joint venturer does not logically exclude the possibility that some jurors found that the defendant was the shooter (and thus was guilty as a principal), but also believed that he acted as a participant in a joint venture, while others found that the defendant engaged in a joint venture with the shooter, and thus all were willing to join in selecting the joint venture verdict option. To meet the elements of joint venture the Commonwealth "need not prove that someone other than the defendant was the actual perpetrator." *Commonwealth* v. *Netto*, 438 Mass. 686, 701 (2003). We cannot say that the

jurors would necessarily have believed, from the definitions provided in the jury instructions, that principal liability and joint venture liability were logically incompatible, or that, by voting to convict on joint venture, they were indicating that they had unanimously agreed that the Commonwealth had failed to prove that the defendant was the shooter. Because we cannot infer a unanimous acquittal from the record before us, the Commonwealth may retry the defendant on the theory of principal liability.[12]

c. *Further consideration of joint venture.* The theory of "joint venture" liability finds its roots in the concept of accessorial or accomplice liability. While accomplice liability has a common-law origin, Massachusetts, like the Federal government and most States, has enacted statutory provisions, G. L. c. 274, §§ 2 and 3, which declare that a person who aids and abets the commission of a felony is as guilty of that crime as the principal. See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856-858 (1997) (*Ortiz*), for a discussion of relevant history. See also 18 U.S.C. § 2 (2006). Of particular relevance here is G. L. c. 274, § 2, which states: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."[13]

In earlier cases, this court used the language of aiding and abetting, not the language of joint venture, and characterized a defendant who aided and abetted the commission of a crime as

---

[12]In *Rendon-Alvarez* v. *Commonwealth*, 437 Mass. 40 (2002), a case involving a defendant charged with trafficking in cocaine, the trial judge instructed the jury on both individual and joint venture liability, gave the jury a verdict slip that separately specified individual and joint venture liability, and, as in this case, instructed the jury that they were to check only one box. The jury checked the box for joint venture liability and confirmed that they had found the defendant guilty as a joint venturer in open court. *Id.* at 43. This court concluded that because the jury did not check the box for principal liability, the defendant was "therefore acquitted under that theory." *Id.* at 43-44. For the reasons discussed in the text, we no longer consider this analysis to be correct, and we now overrule that aspect of the *Rendon-Alvarez* decision.

[13]General Laws c. 274, § 3, addresses a series of procedural issues that arise in connection with the prosecution of one who "counsels, hires or otherwise procures a felony to be committed." See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 857 & n.5 (1997) (*Ortiz*).

a principal. A defendant would be guilty as a principal if "at the time when the felony was committed, he cooperated with the chief perpetrator, and aided and abetted him in doing the acts which constituted the crime." *Commonwealth* v. *Lucas*, 2 Allen 170, 171 (1861). See *Commonwealth* v. *Knapp*, 9 Pick. 495, 516-518 (1830) ("The person charged as a principal . . . must be aiding and abetting the murder"). While these cases required the defendant to be "present" at the crime in order to be guilty as a principal, his physical presence at the exact scene of the crime was not required. *Commonwealth* v. *Lucas*, *supra* at 171; *Commonwealth* v. *Knapp*, *supra* at 517-518. Rather, an accomplice was deemed "present" if he was in a position to provide aid and assistance to the chief perpetrator of the offense, who knew of the accomplice's agreement and availability to assist if needed. See *Commonwealth* v. *Lavery*, 255 Mass. 327, 333 (1926) (defendant may be found guilty as principal if he planned with another to commit breaking and entering with intent to commit larceny, waited in automobile at convenient place in neighborhood while crimes were committed, and was to meet his accomplice after being given signal to aid him in getting away); *Commonwealth* v. *Lucas*, *supra* at 171.[14]

In *Commonwealth* v. *Soares*, 377 Mass. 461, 470, cert. denied, 444 U.S. 881 (1979) (*Soares*), this court used the language of aiding and abetting in articulating the theory of joint venture, or joint enterprise, declaring: "The theory underlying joint enterprise is that one who aids, commands, counsels, or encourages

[14]"To charge a person as a principal, a strict, actual, immediate presence at the time and place of the commission of the crime is not necessary. Nor is it requisite that he should be so situated as to be an eye or ear witness of the criminal act. It is the expectation of aid, in case it is necessary to the completion of the crime, and the belief that his associate is near and ready to render it, which encourage and embolden the chief perpetrator, and incite him to accomplish the act. By the countenance and assistance which the accomplice thus renders, he participates in the commission of the offence. It is therefore sufficient to hold a party as principal, if it is made to appear that he acted with another in pursuance of a common design; that he operated at one and the same time for the fulfilment of the same preconcerted end, and was so situated as to be able to furnish aid to his associate, with a view to insure success in the accomplishment of the common enterprise." *Commonwealth* v. *Lucas*, 2 Allen 170, 171 (1861). See *Commonwealth* v. *Soares*, 377 Mass. 461, 471-472, cert. denied, 444 U.S. 881 (1979), quoting *Commonwealth* v. *Knapp*, 9 Pick. 496, 518 (1830).

commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal." Applying this formulation, the *Soares* court concluded that the evidence was sufficient to sustain the convictions of murder in the first degree of two defendants who had aided and abetted a third man, who had fatally stabbed the victim. *Id.* at 470-472. One year after the *Soares* decision, in *Commonwealth* v. *Casale*, 381 Mass. 167 (1980), this court applied the *Soares* formulation of the joint venture rule to a substantially different set of facts, where the victim had been shot by a gun fired from a playground where the two codefendants were seen (with three others), but there was no evidence as to who had actually fired the gun. See *id.* at 173-174.

Then in *Commonwealth* v. *Bianco*, 388 Mass. 358, *S.C.*, 390 Mass. 254 (1983) (*Bianco*), a case that, like the *Casale* case, presented evidence of several individuals physically present and a crime being committed, but no evidence that specifically identified one or more as the chief perpetrator and others as accomplices, this court articulated a new formulation of joint venture liability. Without reference to G. L. c. 274, § 2, and without using the language of aiding and abetting, we stated: "The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary." *Bianco, supra* at 366, citing *Commonwealth* v. *Casale, supra* at 173.

The *Bianco* decision's formulation of the joint venture test has become the standard definition of joint venture, recited repeatedly in appellate decisions and also in jury instructions used by many trial judges.[15] This standard definition of joint venture liability has proven to be a source of confusion to jurors and judges.

---

[15]See, e.g., *Commonwealth* v. *Clemente*, 452 Mass. 295, 331 (2008), cert. denied, 129 S. Ct. 1329 (2009); *Commonwealth* v. *Berry*, 431 Mass. 326, 330 (2000); *Ortiz, supra* at 856; *Commonwealth* v. *Green*, 420 Mass. 771, 779 (1995); *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988); *Commonwealth* v. *Gonzalez*, 68 Mass. App. Ct. 91, 93 (2007); *Commonwealth* v. *Clements*, 51 Mass. App. Ct. 508, 536 (2001), *S.C.*, 436 Mass. 190 (2002); *Commonwealth* v. *Lee*, 43 Mass. App. Ct. 164, 167 (1997); 2 Massachusetts Superior Court Criminal Practice Jury Instructions § 4.4 (Mass. Cont. Legal Educ. 1999 & Supp. 2003). See also Instruction 4.200 of the Criminal Model Jury Instructions for Use in the District Court (2009) (substantially rephrasing but referenc-

Even though "one who aids, commands, counsels, or encourages the commission of a crime while sharing with the principal the mental state required for the crime is guilty as a principal," *Soares*, *supra* at 470, juries are often told that the principal is the person who commits the crime, in contrast with the accomplice, accessory before the fact, or joint venturer, who is present and willing and available to help the principal commit the crime. As a result, while we renounce the false distinction between a principal and an accomplice, and have recognized that the accomplice commits the crime no less than the principal, the language of jury instructions often retains that distinction.

Similarly, although we have stated in *Commonwealth* v. *Santos*, 440 Mass. 281, 290 (2003), that principal liability is not a separate "theory" distinct from joint venture liability, we nevertheless continue to speak of them as such. There, we declared that a jury need not make separate findings regarding principal liability and joint venture liability by using a special verdict slip, and need not be unanimous as to whether they find the defendant guilty as a principal or joint venturer. See *id*.[16] Yet, even after our declaration in the *Santos* case that principal and joint venturer

ing original version in *Commonwealth* v. *Bianco*, 388 Mass. 358, *S.C.*, 390 Mass. 254 [1983]).

While the *Bianco* decision's formulation has become the standard definition of joint venture, it is not the only definition. Fourteen years after the *Bianco* decision, we noted in *Ortiz*, *supra* at 856:

> "Our decisions have set forth two theories that can sustain a defendant's conviction as a joint participant with another (or others) in the commission of a felony. A defendant can be convicted as a joint participant in a felony, if he or she was '(1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary.' *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988), quoting *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983). A defendant may also be convicted as a joint participant in a felony if the defendant 'aids in the commission of a felony, or is an accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed.' G. L. c. 274, § 2." (Footnote omitted.)

[16]The precise language in *Commonwealth* v. *Santos*, 440 Mass. 281, 290 (2003), reads:

> "We have also rejected the argument that the jury must be unanimous as to whether guilt is based on liability as a principal or as a joint

liability are not different theories of guilt, we continue to examine general verdicts as if they were, determining whether the evidence is sufficient to support a finding of guilt as to both principal and joint venture liability when each is alleged and when it is not clear from the general verdict which theory the jury adopted. See, e.g., *Commonwealth* v. *Williams*, 450 Mass. 894, 898-899 (2008); *Commonwealth* v. *Smith*, 450 Mass. 395, 403-404, cert. denied, 129 S. Ct. 202 (2008); *Taylor* v. *Commonwealth*, 447 Mass. 49, 54 (2006). This bifurcated analysis of the sufficiency of evidence on a general verdict implicitly encourages judges to furnish a special verdict slip asking the jury to decide whether they found the defendant guilty as a principal or a joint venturer, because without a special verdict a new trial will be ordered if the evidence is insufficient as to *either* principal *or* joint venture liability. See *Commonwealth* v. *Cannon*, 449 Mass. 462, 463, 467-468 (2007); *Commonwealth* v. *Rolon*, 438 Mass. 808, 819-820 (2003).[17] The inevitable risk posed by special verdict slips is a greater number of mistrials arising from hung juries, because jurors may all agree that the defendant knowingly participated in the commission of the crime but differ as to whether he did so as a principal or a joint venturer.[18] Moreover, when a judge asks a jury to determine whether a defendant is guilty on a theory of joint venture, it is generally not clear whether the judge is asking the jury to determine if the defendant was an accomplice to the

---

venturer. See *Commonwealth* v. *Ellis*, 432 Mass. 746, 761 (2000); *Commonwealth* v. *Nolan*, 427 Mass. 541, 544 (1998). While we sometimes use the term 'theory' of principal liability or 'theory' of joint venture, those are not alternate, differing 'theories' of the crime that are to be subjected to the specific unanimity and verdict slip requirements of [*Commonwealth* v. *Berry*, 420 Mass. 95, 112 (1995), and *Commonwealth* v. *Accetta*, 422 Mass. 642, 647 (1996)]."

[17]We have even noted that the "better practice" is for the judge "to provide a verdict slip requiring the jurors to specify on which theory (or theories) they convict a defendant." *Commonwealth* v. *Perry*, 432 Mass. 214, 221 n.5 (2000). Accord *Commonwealth* v. *Maynard*, 436 Mass. 558, 661 n.2 (2002).

[18]See Note 12 to Instruction 4.200 of the Criminal Model Jury Instructions for Use in the District Court, *supra* at 13 ("A special verdict slip on which the foreperson must indicate whether a guilty verdict was based upon the 'principal' or 'joint venture' theory could artificially restrict the jury from returning a unanimous verdict of guilt even though all jurors concluded that the defendant was guilty, but some concluded he was guilty as a joint venturer and others as a principal").

chief perpetrator of the crime, or if the defendant knowingly participated with another in the commission of the crime, either as the chief perpetrator or as an accomplice.

Moreover, the so-called model jury instructions encourage judges to instruct on the required elements of the charged offense, and then separately instruct on joint venture liability, identifying the three familiar elements that the Commonwealth must prove to establish guilt as a joint venturer ([1] present at the scene of the crime, [2] with knowledge that another intends to commit the crime or with intent to commit a crime, and [3] by agreement is willing and available to help the other if necessary), as if the required elements of the charged offense apply only to prove principal liability and the joint venture elements apply only to prove joint venture liability.[19] This separate narration of the elements may be confusing to jurors, who should understand that, to find the defendant guilty as a joint venturer, they must find that the Commonwealth has proved both the elements of the offense and the defendant's knowing participation in the offense.[20]

All of this confusion and complexity might be tolerable if there were no reasonable alternative, but there is a reasonable, and far simpler, alternative: (1) instruct the jury that the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense; (2) continue to permit the trial judge to furnish the jury with a general verdict even when there is differing evidence that the defendant committed the crime as a

---

[19]See Instruction 4.200 of the Criminal Model Jury Instructions, *supra*; 2 Massachusetts Superior Court Criminal Practice Jury Instructions, *supra* at § 4.4.

[20]The elements of joint venture may prove especially confusing in a murder case, when a lesser crime committed by a group of assailants, such as an assault and battery, escalates into a murder. The joint venture instructions tell the jury that the defendant is guilty if he is present at the scene with knowledge that another intends to commit "the crime" or with intent to commit "a crime," and by agreement is willing and available to help the other if necessary. To a juror, "the crime" may mean the initial assault and battery, not the subsequent murder, but this critical distinction is nowhere clarified in the joint venture instructions. As a result, a confused jury may find a defendant guilty of murder as a joint venturer based on their finding that the defendant shared the intent to commit the initial assault and battery, perhaps not even considering whether the defendant shared the required intent of malice.

principal or as an accomplice; and (3) on conviction, examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime.

This formulation is hardly novel; it best reflects the spirit behind the common law as now reflected in the aiding and abetting statute, G. L. c. 274, § 2, which declares the aider and abettor to be as culpable as the chief perpetrator of the offense. See *Ortiz, supra* at 858 (effect of G. L. c. 274, § 2, "is to hold the criminal actor who participates in a felony liable as a principal without regard to whether the felony is completed or committed by another"). At its core, joint venture criminal liability has two essential elements: that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent. A jury instruction that the Commonwealth must prove that the defendant knowingly participated in the commission of the crime charged with the intent required for that crime avoids burdening the jury with the legal construct of joint venture and allows them instead to focus on the essence of a joint venture allegation. If a jury then find the defendant guilty, an appellate court may be certain that the jury unanimously found that the defendant knowingly participated in the crime charged with the required intent, and may then determine whether the evidence was sufficient to support their finding. Streamlining the instruction will both eliminate the danger that a defendant will be convicted without the jury's having found that the essential elements of joint venture liability have been proved and, at the same time, diminish the risk of a "hung jury" and mistrial in circumstances where the jury unanimously finds that the defendant participated in the crime charged with the required intent but are divided as to the defendant's precise role in the commission of the crime.

We, therefore, now adopt the language of aiding and abetting rather than joint venture for use in trials that commence after the issuance of the rescript in this case.[21] When there is evidence that more than one person may have participated in the commission of the crime, judges are to instruct the jury that the

---

[21]Because this change in language affects only future cases, it has no bearing on cases already tried.

defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense.[22] See Appendix.

We continue to permit the trial judge to furnish the jury with a general verdict slip even when there is differing evidence that the defendant committed the crime as a principal or as an accomplice.[23] Now, however, on appeal after a conviction, we will examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime, rather than examine the sufficiency of the evidence separately as to principal and joint venture liability.

This shift from the language of joint venture to the language of aiding and abetting does not enlarge or diminish the scope of existing joint venture liability. Nor should it be understood to interfere with a trial judge's ability to take steps to ensure that the jury's verdict rests on sufficient evidence. Rather, by abandoning the language of joint venture and returning to the more simple and appropriate language of aiding and abetting in the commission of a criminal act, we hope to provide clearer guidance to jurors and diminish the risk of juror confusion in cases where two or more persons may have committed criminal acts.[24]

---

[22]Judges, when practicable, should incorporate their instructions regarding aiding and abetting into the elements of the crime. For instance, in cases charging murder in the first degree where two or more persons may have participated in the killing, the first element, "that the defendant committed an unlawful killing," should be changed to "that the defendant knowingly participated in the commission of an unlawful killing." See Appendix.

[23]Federal courts do not generally ask juries to return special verdicts designating whether they find the defendant guilty as a principal (chief perpetrator) or aider and abettor, or otherwise require juries to reach unanimity as to this issue. See *United States* v. *Horton*, 921 F.2d 540, 544 (4th Cir. 1990), cert. denied, 501 U.S. 1234 (1991). See also *United States* v. *Wilson*, 629 F.2d 439, 444 (6th Cir. 1980), quoting 8A Moore's Federal Practice and Procedure § 31.02[3] ("In general, special verdicts are not favored [in criminal cases] and 'may in fact be more productive of confusion than of clarity' "); *United States* v. *Spock*, 416 F.2d 165, 181-183 (1st Cir. 1969) (addressing reasons for not allowing special verdicts in criminal cases; holding submission of ten special questions to jury to be prejudicial error).

[24]The dissent contends that we "appear[] to seek to make it easier to sustain

3. *Other issues.* In connection with our duty to examine the entire record, pursuant to G. L. c. 278, § 33E, we note that the defendant timely requested a jury instruction regarding the police failure to record the defendant's interrogation. See *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 447-448 (2004). The judge declined to issue the instruction, apparently because the *DiGiambattista* case was decided after the interrogation. That was error. The *DiGiambattista* instruction is available to defendants in trials occurring after the issuance of the decision, regardless of the date of interrogation. See *Commonwealth* v. *Dagley,* 442 Mass. 713, 721 (2004), cert. denied, 544 U.S. 930 (2005). At any retrial, the *DiGiambattista* instruction should be given if the defendant so requests.

We further note that the prosecutor's closing argument arguably suggested that there was evidence that may have supported a jury instruction on manslaughter. The prosecutor asked: "Did [the defendant] shoot [the victim] thinking he had a gun? Probably that, and probably the fact that [the victim's] car was coming over towards his car after the fight had started, after the blood was boiling." At retrial, it may be appropriate for the judge to consider whether the evidence supports a manslaughter instruction based on reasonable provocation. Cf. *Commonwealth* v. *Colon,* 449 Mass. 207, 221, cert. denied, 552 U.S. 1079 (2007) (assuming, without deciding, that car chase "could constitute provocation").[25]

4. *Conclusion.* The defendant's conviction is reversed, the

---

convictions." *Post* at 473. We do not seek to make it easier or more difficult to sustain convictions; we simply wish to diminish the risk of juror confusion that may lead to unjust convictions or unjust acquittals.

[25]We add a final point in connection with our review under G. L. c. 278, § 33E. At the trial, one witness, Jorge Lopez, testified during cross-examination that, although he was charged with murder in connection with this case, he had received no promises from the Commonwealth, and was testifying only to "see justice done." It appears from our review of a Superior Court docket that Lopez was never indicted on a charge of murder, and in fact, the grand jury returned a "no bill" on a charge of accessory after the fact on April 15, 2005, approximately three months before he testified against the defendant in this case. We do not suggest that these facts reflect an agreement between Lopez and the Commonwealth before the defendant's 2005 trial, but we do suggest that the judge make appropriate inquiry of the Commonwealth into this matter prior to the commencement of retrial.

verdict is set aside, and the case is remanded to the Superior Court for a new trial on principal liability only.

*So ordered.*

APPENDIX.

An appropriate jury instruction would declare that:

"A defendant knowingly participates in the commission of an offense if he [she] intentionally participates in some meaningful way in the commission of the offense, with the intent required to commit the offense. Such participation may take any of several forms. It may take the form of personally committing the acts that constitute the crime, or of aiding or assisting another in those acts. It may take the form of asking or encouraging another person to commit the crime, or helping to plan the commission of the crime. Alternatively, it may take the form of agreeing to stand by at, or near, the scene of the crime to act as a lookout, or to provide aid or assistance in committing the crime, or in escaping, if such help becomes necessary. The agreement to help if needed does not need to be made through a formal or explicit written or oral advance plan or agreement; it is enough consciously to act together before or during the crime with the intent of making the crime succeed.

"The Commonwealth must also prove beyond a reasonable doubt that, at the time the defendant knowingly participated in the commission of the crime charged [identify the crime charged if needed to avoid confusion], he [she] had or shared the intent required for that crime. You are permitted, but not required, to infer the defendant's mental state or intent from his [her] knowledge of the circumstances or any subsequent participation in the crime. The inferences you draw must be reasonable, and you may rely on your experience and common sense in determining the defendant's knowledge and intent.

"Mere knowledge that a crime is to be committed is not sufficient to convict the defendant. The Commonwealth must also prove more than mere association with the perpetrator of the crime, either before or after its commission. It must also prove more than a failure to take appropriate steps to prevent the commission of the crime.

"Mere presence at the scene of the crime is not enough to find a defendant guilty. Presence alone does not establish a defendant's knowing participation in the crime, even if a person knew about the intended crime in advance and took no steps to prevent it. To find a defendant guilty, there must be proof that the defendant intentionally participated in some fashion in committing that particular crime and had or shared the intent required to commit the crime. It is not enough to show that the defendant simply was present when the crime was committed or that he [she] knew about it in advance."

See Massachusetts Superior Court Criminal Practice Jury Instructions § 4.4

(Mass. Cont. Legal Educ. 1999 & Supp. 2003). See also Instruction 4.200 of the Criminal Model Jury Instructions for Use in the District Court (2009).

COWIN, J. (dissenting). The concept of criminal liability based on joint venture is a difficult one, and the court's opinion thoughtfully explores some of the problems that have arisen in applying that concept. But rather than adopting available solutions consistent with the nature of joint venture criminal liability, the court treats the problems essentially by defining them out of existence, conflating two different offenses into one, and abandoning meaningful judicial review of questions regarding sufficiency of evidence. While this approach may make life easier for trial and appellate judges, it does so at the expense of due process for affected defendants. Accordingly, I respectfully dissent.

The court labels our traditional distinction between a principal and an accomplice (i.e., a joint venturer) a "false distinction," and relies on *Commonwealth* v. *Santos*, 440 Mass. 281, 290 (2003), for the proposition that principal liability is not a separate "theory" distinct from joint venture liability. *Ante* at 464. Ignoring the fact that this distinction has existed in the common law for centuries, and is reflected not only in our statutes, see G. L. c. 274, §§ 2 and 3, but also in those of many other jurisdictions, the court erases fundamental differences between the criminal offender as principal and the criminal offender as joint venturer.

The court's view that crimes committed by a principal and those committed by a joint venturer can be tried and adjudicated as if they were the same thing appears to arise, at least in part, from the joint venture statute itself. That statute provides: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon." G. L. c. 274, § 2. The court concludes that, because the statute "declares the aider and abettor to be as culpable as the chief perpetrator of the offense," *ante* at 467, any distinction between them is essentially meaningless, and potentially a source of confusion in instructing a jury or reviewing a record to determine whether a conviction is supported by sufficient evidence.

The statute in question, of course, does not say any of this.

Rather, it retains the traditional distinction between principal and accessory criminal liability by using precisely those terms. Of greater importance, the statute does not attempt to define or redefine offenses at all. It does nothing more than establish a sentencing policy. The court expands the statute by concluding that, if the sentences for principal and joint venture liability are the same, then those crimes must be the same, a judge-created inference unsupported by the statutory language.

In fact, the offenses are not the same at all. One charged with a crime as a principal must have performed the act or acts that constitute the crime, e.g., pulled the trigger, sold the contraband, taken the money, or entered the building. He may or may not have had assistance; if so, criminal proceedings may be instituted against others. But his conviction as a principal does not depend on any association with, or assistance from, any other person.

By contrast, joint venture liability is based on a concept of *association* in a criminal enterprise. It requires the participation of at least two people. Furthermore, the association must have two characteristics, each of which must be proved by the Commonwealth beyond a reasonable doubt. Unlike a conspiracy, there need be no *agreement* as such between the participants,[1] but they must each satisfy a requirement regarding their respective states of mind: specifically, each must possess the intent necessary for the criminal enterprise to be achieved. In addition, the joint venturer must act to some extent in support of the criminal effort. This can be satisfied by nothing more than willingness and ability to furnish assistance to the principal if necessary. See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 856 (1997).

We have often recognized that criminal liability as a principal and criminal liability as an aider or abettor (joint venturer) are conceptually different. See *Commonwealth* v. *Berry*, 431 Mass. 326, 332-334 (2000); *Commonwealth* v. *Green*, 420 Mass. 771, 779-781 (1995); *Commonwealth* v. *Chipman*, 418 Mass. 262, 267-268 (1994); *Commonwealth* v. *Daughtry*, 417 Mass. 136, 137-141 (1994). Subsequently, we noted in *Commonwealth* v. *Santos*, *supra* at 290, that principal liability and joint venture

---

[1]However, there is an ambiguous use of the word "agreement" in *Commonwealth* v. *Bianco*, 388 Mass. 358, 366, *S.C.*, 390 Mass. 254 (1983), which is repeated in some later decisions. See, e.g., *ante* at 463 n.15.

liability are not separate "theories" underlying the crime charged. That comment, in a case that does not particularly focus on joint venture concepts, relates to the proposition that the jury need not be unanimous in deciding whether the defendant was a principal or a joint venturer as long as there was sufficient evidence to support either role. *Id.* Now the court removes the statement about separate "theories" from its context to support a merging of principal and joint venture liability.

In my view, commission of crimes as a principal or as a joint venturer involves more than simply different theories; the acts are in fact different crimes, with different elements, each of which must be proved by the Commonwealth beyond a reasonable doubt. They require different instructions by the trial judge. The fact that the penalties for the crimes are the same does not transform them into a single offense. Nevertheless, the court concludes that the offenses need not be distinguished in the instructions, thus virtually guaranteeing juror confusion by treating the principal as merely another kind of joint venturer. The chance of an unlawful verdict is then compounded by the decision of the court to restrict the scope of appellate review of the sufficiency of the evidence.

I appreciate the superficial appeal of the court's approach because it emphasizes certain characteristics that do in fact appear in both principal and joint venture liability: knowing participation in the commission of an offense and the requisite intent. But it ignores the factors that distinguish the role of the principal from that of the joint venturer. This introduces into the process a potential for confusion that is unfair to a defendant, and by reducing the scope of appellate review to whether there is evidence of knowing participation and intent, today's decision comes perilously close to the Federal standard of review in principal-joint venture cases set forth in *Griffin* v. *United States*, 502 U.S. 46, 54-56 (1991) (if evidence warrants guilty verdict on one theory but not another, verdict may stand), which we sensibly rejected in *Commonwealth* v. *Plunkett*, 422 Mass. 634, 639-640 (1996).

The court appears to seek to make it easier to sustain convictions: it refers to "[t]he inevitable risk posed by special verdict[s] [of] a greater number of mistrials arising from hung juries." *Ante* at 465. The court also defends its change as one that "avoids

burdening the jury with the legal construct of joint venture and allows them instead to focus on the essence of a joint venture allegation." *Ante* at 467. It is necessary that the jury bear this burden in order to ensure that convictions are based on sufficient evidence informed by instructions that clearly define the elements of the offenses charged.

I prefer greater clarity in jury verdicts regarding principal and joint venture liability, not less. I would continue to have trial judges instruct on the differences between the concepts as they presently do.[2] We should then require, not merely define as "better" practice, see *Commonwealth* v. *Perry*, 432 Mass. 214, 221 n.5 (2000), the use of special verdict slips so that we will know what the jury actually found. Because, as I have suggested, these are different offenses, I would abandon the holdings of *Commonwealth* v. *Ellis*, 432 Mass. 746, 761 (2000), and subsequent cases, and require that a finding that a defendant is guilty as a principal or as a joint venturer be unanimous.[3]

Although I believe that these changes would assist in securing due process for defendants in these circumstances, I recognize that they would be significant alterations that we might not want to adopt all at once. I would at least prefer continuing the present state of the law governing joint venture cases to pretending that principal and joint venture liability are effectively the same thing, and accordingly I dissent.

---

[2] I would, however, take this opportunity to clarify the requirement, or lack thereof, that the joint venturer be "present at the scene of the crime." Compare *Commonwealth* v. *Bianco, supra,* with *Commonwealth* v. *Ortiz,* 424 Mass. 853, 856 & n.4 (1997), and cases cited.

[3] If the evidence warrants, a defendant may be convicted on both theories. In addition, where there is sufficient evidence of a joint venture, it is not necessary that the principal be identified. See *Commonwealth* v. *Netto,* 438 Mass. 686, 700-701 (2003).