After a jury trial in the Superior Court, the defendant, Samuel Ramos, was convicted of two counts of unlawful distribution of heroin and one count of illegal possession of cocaine.[2] In a subsequent jury-waived trial, the defendant was also convicted as a habitual offender. On appeal the defendant argues that (1) the evidence before the grand jury was insufficient to sustain the indictments; (2) the trial evidence was insufficient to sustain his convictions; (3) his motion to suppress should have been allowed because the Terry-type stop was not justified;[3] and (4) the evidence was insufficient to support the habitual offender counts. We affirm.
1. Background. Viewing the evidence in the light most favorable to the Commonwealth, the jury could have found the following facts.
By June, 2015, the Springfield police department had begun an investigation into the distribution of narcotics from an apartment on the first floor of 113 Euclid Avenue (apartment) involving Roberto Morales and Freddie Borrero. As part of that investigation, undercover police officer Christian De La Cruz conducted three "controlled buys" of heroin and cocaine from the suspects, all in front of the apartment, between June 25 and July 2. During at least one of those buys, De La Cruz saw other individuals making what appeared to be narcotics purchases from Borrero and Morales.
On July 8, 2015, police obtained a search warrant for the apartment. Before executing the warrant, De La Cruz was directed to make another controlled buy. Borrero was standing outside the apartment when De La Cruz approached. He consummated the cocaine purchase with Borrero and asked if he had one hundred bags of heroin to sell. Borrero said he did not have that amount and would "have to arrange for someone to deliver that." Borrero made the telephone call to be resupplied in De La Cruz's presence. While they waited, De La Cruz observed other individuals approach the home and purchase narcotics directly from Borrero.
Eventually a Nissan Murano pulled up to the building and stopped. The Murano's driver, later identified as Mark Matthieu, was accompanied by the defendant, who was sitting in the front passenger seat. Referencing the Murano, Borrero indicated to De La Cruz that this was the heroin delivery. Borrero went to the driver's side of the vehicle and De La Cruz saw Borrero hand cash to Matthieu in exchange for an item.
De La Cruz noticed that during the transaction the defendant "looked in the front, he looked to the side, and he looked to the rear." He neither appeared nervous, nor attempted to get out of the vehicle. The defendant's behavior alerted De La Cruz to the possibility that he may have been acting as a lookout. He considered it unlikely that he was merely a buyer because, according to De La Cruz, buyers "typically ... approach [the dealer] very nervously and in a rush" because "[t]hey want to get the drug, use it, and be done with the whole interaction. In any event, as Borrero walked away from the Murano he signaled to De La Cruz to follow and De La Cruz completed the purchase of heroin from Borrero.
Matthieu began to drive the Murano away from the area, together with his passenger, the defendant. Detective Jaime Bruno, who was among the undercover officers surveilling the controlled buy, was directed to follow them. Bruno, an experienced narcotics investigator,[4] explained that drug transactions often occur in a matter of seconds because the details have been arranged in advance by cellular telephone (cell phone). Bruno also testified that he has seen individuals acting as a lookout during a drug transaction. They keep an eye out for anyone "trying to rob the person that is involved in the actual hand-to-hand sale and also to look for police activity, [and] make observations if somebody is approaching where the sale is taking place."
Bruno was able to follow the Murano as it left the scene, without losing sight of the vehicle. The Murano drove directly to a nearby Citgo gasoline (gas) station, without making any intervening stops, and pulled into the parking lot. Bruno parked his vehicle on the opposite side of the gas pump from where the Murano was located. He noticed that a male, later identified as a Mr. Risciotti, had been waiting at the Citgo station when the Murano pulled into the parking lot.
As soon as the Murano stopped, the defendant got out of the vehicle and walked to the front of the store, and Risciotti headed toward the vehicle. The defendant did not go into the store but stood outside appearing to talk on his cell phone while "looking around in different directions." He seemed to have an unobstructed view of the parking lot and "looked around very aware of what was going on, making himself aware of his surroundings." When Bruno refocused on the Murano, he saw Risciotti standing at the driver's side door handing Matthieu cash in exchange for receiving several small white packets. When the transaction was complete, the defendant rejoined Matthieu in the vehicle. Bruno communicated with the other officers in the area and they moved in and arrested all three suspects.
A search of the defendant turned up a plastic bag that contained five glassine packets that were secured with a rubber band and later found to contain heroin. A small packet was retrieved from the defendant's pants pocket containing a substance that was later determined to be cocaine, and police also found a cell phone in his possession. No other phone or implements of drug use were found either in the Murano or in the possession of either occupant.
A narcotics expert, Lieutenant Steven Kent, testified to the characteristics of a lookout in a drug transaction. According to Kent, the individual does not pay attention to the drug deal, but is instead looking around at cars going by, cars in the parking lot, and checking for police. A lookout will often put himself in a better position to view the entire scene, rather than stay at the location of the transaction. Their head appears to be "on a swivel," surveying the area. In addition, when an individual who has arrived with a drug dealer and engages in behaviors consistent with that of a lookout returns to the vehicle, and prepares to leave with the same individual instead of leaving the scene, the behavior further bolsters the conclusion that the person is acting as a lookout. Based on the police report and additional facts provided in questions posed by the prosecutor, Kent gave an opinion that the defendant's behavior was consistent with someone acting as a lookout during a drug transaction.
Kent also gave an opinion that the five packets of heroin found on the defendant were consistent with selling drugs, not using them. Given that heroin is usually packaged in bundles of ten bags, the remaining five bags bundled together with a rubber band suggested to Kent that the other bags had been pulled off and sold. Kent testified that the lack of implements to use narcotics is more consistent with dealing drugs than using them. In addition, Kent testified that because only the defendant had a cell phone, it indicated customers were communicating with the defendant as opposed to the driver. Based on these circumstances, Kent opined that the defendant's behavior was "consistent with a person acting in concert with another person to distribute heroin."[5]
2. Discussion. a. Grand jury evidence. The defendant first contends that the indictments were not supported by probable cause.[6] To sustain an indictment, the evidence presented to the grand jury need only be " 'sufficient to warrant a reasonably prudent [person] in believing that the [accused] had committed' the offense." Commonwealth v. Rakes, 478 Mass. 22, 29 (2017), quoting from Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982). " 'This standard ... has been employed primarily to strike down indictments in cases where a grand jury has heard ... no evidence whatever that would support an inference of the defendant's' guilt." Ibid., quoting from McCarthy, supra.
In this case the grand jury heard evidence similar to that adduced at trial. Specifically, they heard Officer De La Cruz's account of the investigation as it appeared in his police report, including what he and other officers observed at both the apartment and the Citgo station on July 8, 2015. The grand jury were also informed that the defendant was arrested in possession of cocaine and heroin that day.[7]
This evidence is sufficient to warrant a finding of probable cause to believe the defendant was assisting the driver of the Nissan Murano in the delivery of narcotics to at least the male at the Citgo station. See Commonwealth v. Ward, 45 Mass. App. Ct. 901, 902 (1998) ; Commonwealth v. Lara, 58 Mass. App. Ct. 915, 915-916 (2003).
b. Sufficiency of the evidence at trial. Viewed in the light most favorable to the Commonwealth, there was also sufficient evidence to support the defendant's conviction under a theory of joint venture. The defendant's presence, in combination with " 'plus' factors, 'i.e., incriminating evidence of something other than presence,' " establish that he was engaged in a joint venture with Matthieu. Id. at 916, quoting from Commonwealth v. Velasquez, 48 Mass. App. Ct. 147, 149 (1999). See Commonwealth v. Zanetti, 454 Mass. 449, 467 (2009) ("joint venture criminal liability has two essential elements: that the defendant knowingly participated in the commission of the crime charged, and that the defendant had or shared the required criminal intent"). These plus factors are (1) the defendant's presence and behavior in the Murano while Matthieu sold drugs from the driver's seat at Euclid Avenue; (2) the defendant continuing with Matthieu to the Citgo station and his immediate departure from the vehicle upon their arrival as a male approached; (3) the defendant taking up a stance outside the Citgo store while "look[ing] around ... making himself aware of his surroundings" as Matthieu sold drugs to the male; (4) the defendant rejoining Matthieu in the vehicle as soon as the transaction was complete; (5) the defendant being the only individual in the Murano with a cell phone, together with evidence that the Euclid Avenue dealer had ordered a resupply of heroin via telephone; and (6) the defendant found in possession of drugs packaged in a manner consistent with distribution. With respect to the third and fifth factors, police opinion testimony bolstered the conclusion that the defendant's actions were consistent with those of a lookout, and that the defendant was likely communicating with customers because only he possessed a cell phone.[8]
Viewing the evidence in totality, including the reasonable inferences drawn therefrom, the jury could conclude that the defendant and Matthieu were engaged in a joint enterprise to sell cocaine and heroin. Not only does the evidence show that the defendant acted as a lookout on at least one occasion, but also that he kept some of the drugs for sale on his person, that he communicated using his cell phone with those seeking to buy narcotics, and that he did so working in concert with Matthieu. See Commonwealth v. Pope, 15 Mass. App. Ct. 505, 510-511 (1983), quoting from Commonwealth v. Conroy, 333 Mass. 751, 755 (1956) (defendant's location at the time of a home break-in by another permitted inference that defendant "by prearrangement was stationed in a position where he might render ... aid and encouragement"); Ward, 45 Mass. App. Ct. at 902 (a person who acts as a lookout while others engage in a crime can be convicted as a joint venturer); Lara, 58 Mass. App. Ct. at 915-916.
Commonwealth v. Saez, 21 Mass. App. Ct. 408 (1986), relied on by the defendant, is different than the present case. There, the evidence showed that one Gonzales approached the defendant, Saez, and spent over an hour with him. During this period, Saez was seen "loo[king] up and down the street" (1) while Gonzales engaged in an apparent drug transaction right next to him; and (2) as Gonzales hid drugs nearby. See id. at 409. The men had just separated when Saez examined the street the second time, and there was no evidence that they reunited or even communicated thereafter. Ibid. The court found that the Commonwealth's evidence was "notable for its lack of detail" and that Saez's conduct was "ambiguous," "commonplace," and "equally" suggestive of innocent motive. Id. at 411-412 (citation omitted). By contrast, here, as discussed above, there was ample and detailed evidence of coordination between the defendant and Matthieu, which showed that they were working in sync to complete a prearranged drug sale. This included evidence that the defendant was found to be in possession of (a) contraband packaged in a manner consistent with sales, and (b) the only cell phone, which, by reasonable inference, could have been used to communicate with customers. In this case, unlike in Saez, the plus factors tip the scale in favor of sufficiency.
c. Motion to suppress. The defendant also argues, relying again on Saez, supra, that his motion to suppress was improperly denied because the evidence did not support a finding that the police had reasonable suspicion to stop the defendant. Based on the evidence discussed above, we agree with the motion judge that the collective knowledge of the police "provided reasonable suspicion to believe that ... Matthieu and [the defendant] were engaging in illicit drug distribution" and were therefore "justified in stopping the Murano." See Commonwealth v. Andrews, 34 Mass. App. Ct. 324, 327 (1993).
d. Habitual offender enhancement. Lastly, the defendant argues that the habitual offender portion of the indictment should be dismissed because it shows only one prior criminal episode. The argument is unavailing. The evidence presented to the grand jury makes clear that the first conviction, for unarmed robbery, occurred on March 28, 2011, and the second conviction, for breaking and entering, occurred on April 28, 2011. See G. L. c. 279, § 25(a ). Contrast Commonwealth v. Garvey, 477 Mass. 59, 68 (2017) (affirming order dismissing habitual offender portions of indictments where "the grand jury heard no evidence that would allow them to conclude that the defendant's prior convictions stemmed from separate criminal episodes").
Judgments affirmed.

The defendant was originally charged with unlawful possession of cocaine with the intent to distribute, but at the conclusion of the Commonwealth's case the judge allowed so much of the defendant's motion for a required finding of not guilty as reduced the count to illegal possession of cocaine.

See Terry v. Ohio, 392 U.S. 1 (1968).

At that time, Bruno had worked in the Springfield police department for twenty years, and during the last fifteen years he had been assigned to the narcotics bureau including eight years as an undercover officer making purchases of narcotics. He testified he had been involved in thousands of street level heroin and cocaine transactions.

The first time Kent gave an opinion, the defendant objected, on the second occasion, he did not.

The defendant does not claim that the evidence before the grand jury was insufficient to establish his identity. See Commonwealth v. McCarthy, 385 Mass. 160, 163 (1982) (evidence must be sufficient "to establish the identity of the accused ... and probable cause to arrest him").

The evidence before the grand jury showed that the defendant was the sole passenger in the Murano that stopped at 113 Euclid Avenue -- a site known by police for the sale of drugs -- where the driver delivered narcotics that had been ordered, before continuing to a nearby Citgo gas station. Upon arrival at the Citgo station, the defendant exited the vehicle and walked to the front of the store and looked around as if he was a lookout, while a male who had been waiting at the gas station approached the vehicle. The male purchased narcotics from the driver and, as he walked away, the defendant returned to the vehicle. All three men were then arrested. Both a bag of cocaine and heroin were found in the defendant's possession. The driver's wallet was located in the glove compartment and contained $800.

We reject the defendant's claim that Kent, a nonpercipient police witness, was improperly allowed to give an opinion that the defendant's behavior was consistent with that of a lookout. See Commonwealth v. Miranda, 441 Mass. 783, 794 (2004). Kent's opinion was not only based on the police report, but also on facts provided by the prosecutor during questioning and, therefore, had a sufficient foundation. Even if we were to conclude otherwise, the testimony was not unduly prejudicial. The judge plainly instructed the jury that they could reject expert testimony, and this instruction in combination with testimony that is not challenged on appeal from percipient police witnesses that included a description of a lookout's behavior, provided sufficient detail to allow the jury to form their own opinion regarding the defendant's behavior without the expert's opinion.