NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12649

COMMONWEALTH  vs.  DAX GIBSON.

Worcester.      February 10, 2023. - August 10, 2023.

Present:  Budd, C.J., Gaziano, Lowy, Wendlandt, & Georges, JJ.

Homicide.  Felony-Murder Rule.  Home Invasion.  Armed Assault in
    a Dwelling.  Armed Assault with Intent to Rob.  Firearms.
    Joint Enterprise.  Practice, Criminal, Capital case, New
    trial, Assistance of counsel, Instructions to jury,
    Duplicative convictions.

Indictments found and returned in the Superior Court
Department on August 12, 2013.

The cases were tried before Richard T. Tucker, J., and a
motion for a new trial, filed on July 29, 2021, was heard by
Valerie A. Yarashus, J.

Jennifer H. O'Brien for the defendant.
Donna-Marie Haran, Assistant District Attorney, for the
Commonwealth.

GAZIANO, J.  In February 2016, a Superior Court jury

convicted the defendant of murder in the first degree on a

theory of felony-murder and related robbery and firearms

offenses in connection with the shooting death of Luis Rodriguez

during a botched robbery.  At trial, the Commonwealth alleged that the defendant was the shooter, recruited by Dinkue "D" Brown,[1] who wanted to teach the victim a lesson by robbing him. In execution of this plan, the defendant went to the victim's apartment, knocked on the door, and pushed past the victim into the apartment when the victim answered the door.  A fight ensued, after which the defendant fatally shot the victim.

In his direct appeal, consolidated with his appeal from the denial of his motion for a new trial, the defendant raises an assortment of arguments.  He first claims that a new trial is necessary because trial counsel was ineffective for failing to introduce exculpatory telephone records.  The defendant also contends that the predicate felony of armed assault in a dwelling merged with the killing of the victim and could not support his felony-murder conviction.  Moreover, the defendant argues that his conviction of armed assault with intent to rob violated his right to be free from double jeopardy.  The defendant further claims that the trial judge erred in instructing the jury on joint venture and submitting a general verdict to the jury.  In addition, the defendant requests that we vacate his firearms-related convictions in light of our

---

[1] After a jury trial in September 2016, Brown was convicted of murder in the first degree and other offenses.  His direct appeal is pending in this court.  Commonwealth vs. Brown, SJC-12650.

recent opinion in Commonwealth v. Guardado, 491 Mass. 666 (2023). Finally, the defendant asks this court to exercise its extraordinary authority pursuant to G. L. c. 278, § 33E, and grant him a new trial or reduce the murder conviction to a lesser degree of guilt.

For the reasons that follow, we vacate the defendant's firearms-related convictions. After having carefully examined the record and considered the defendant's arguments, we affirm the defendant's conviction of murder in the first degree based on a theory of felony-murder, as well as his convictions of home invasion and armed assault with intent to rob, and we also affirm the denial of his motion for a new trial.[2]

1. Background. We summarize the facts the jury could have found, reserving certain details for later discussion.

a. Events prior to the shooting. At the time of his death, the victim lived on the third floor of an apartment building in Fitchburg and was a known drug dealer. A mutual friend of both the defendant and the victim, Brown sold drugs supplied by the victim.

---

[2] The defendant argues, and the Commonwealth concedes, that his conviction of armed assault in a dwelling is a lesser included offense that is duplicative of his conviction of murder in the first degree based on the theory of felony-murder. We therefore vacate the defendant's conviction of armed assault in a dwelling. See Commonwealth v. Rivera, 445 Mass. 119, 132 (2005).

On the night of June 20, 2013, the victim and his girlfriend, Cendy Mejia-Rincon, met the victim's friends, including Brown, Mallory Nooks, and Joseph Dale, to go to a bar, and they ended the night at the victim's apartment. During that night, the victim made a disparaging comment to Brown, and later, the victim intervened in an altercation between Brown and Nooks, telling Brown he needed to show women more respect. At some point, while the group was at the victim's apartment, the victim asked Brown to pay a debt. Brown pulled out a one hundred dollar bill and told the victim he would pay him the rest later that day. The gathering ended around 6 A.M., and the victim and Mejia-Rincon went to bed.

The next day, at around 9 A.M., Michele Kelley went to Brown's apartment in Fitchburg to pick up Brown in her blue 2006 sport utility vehicle (SUV), so that the two could deliver drugs. Kelley's friend, Jenna Kearchner, and Kelley's twenty month old son joined Kelley and Brown on their delivery route. They conducted from six to eight drug deliveries over the course of one to two hours. During this time, Brown talked on his cell phone and was aggravated because the victim was "badmouthing him" and making him look "bad" by saying that Brown had not paid money he owed the victim. Brown stated that "he needed to do something about it."

Brown telephoned his girlfriend, Gihan Alcantara, and told her that he needed his gun.  He instructed Alcantara to leave it under the seat of a vehicle parked in front of her house in Fitchburg.  Kelley drove to Alcantara's residence, and Brown ordered Kearchner to retrieve the "package" from under the seat of the parked vehicle.  Kearchner complied and returned to the car with a plastic shopping bag containing a revolver wrapped in a T-shirt.  Brown inspected the revolver and then telephoned the defendant, telling him that Brown "needed him . . . right away" to do "something," and that the defendant would "be paid well." Brown then ordered Kelley to drive him to pick up the defendant.

At the time, the defendant had been dating and living with his girlfriend, Ashley Fruguglietti, and their infant son in an apartment in Gardner.  On that day, Fruguglietti had arranged for her friend, Alicia Francis, to drive her to an appointment at 1 P.M. while the defendant was to stay with their son.  At some time between 11 A.M. and 12 P.M., after Francis had arrived to meet Fruguglietti, the defendant received a telephone call and provided the caller with directions to their home.[3]  He told Fruguglietti that he could no longer watch their son, because

_____

[3] Fruguglietti testified that the telephone call occurred between 11 A.M. and 11:30 A.M., while Francis testified that the telephone call occurred around noon.

"he had to go take care of something."  The defendant left the apartment at around 12:10 P.M.

When Kelley's car arrived at the defendant's residence, the defendant entered the back seat with a black duffel bag containing firearms and knives, and he was wearing a black hooded sweatshirt, black pants, sneakers, and a black hat. During the twenty-minute car ride to the victim's residence, the defendant and Brown discussed how the defendant would rob the victim of his drugs and cash, and that Brown would keep the cash and the defendant would keep the drugs.  The defendant removed the revolver from the bag and examined it.  As Kelley's car approached the victim's residence in Fitchburg, Brown provided the defendant with instructions and a description of the layout of the victim's apartment; Brown warned the defendant that the victim's girlfriend, Mejia-Rincon, might be present.

After surveying the apartment and street, the group returned to Brown's apartment, where Brown ordered Kearchner and Kelley's son to stay with Dale, to be held as "collateral."[4] Kelley, Brown, and the defendant then left for the victim's apartment in Kelley's blue SUV; Kelley drove, Brown sat in the front passenger's seat, and the defendant sat in the middle seat of the row behind Kelley and Brown.  Kelley parked near the

---

[4] Dale was tried jointly with the defendant on three charges of kidnapping, on which he was acquitted.

victim's building, with her car angled slightly outward so that they could leave quickly.  The defendant wrapped a black T-shirt around his head and face, leaving only his eyes visible, stepped out of the vehicle, and walked to the victim's apartment.

b.  The shooting.  Mejia-Rincon testified that at "[a]bout twelve" or "noontime," she heard a knock at the door; she remained in the bedroom while the victim tossed a gun on the bed, left the bedroom, went to the door, and asked who was there.  Mejia-Rincon heard, "It's D," but she did not readily recognize the man's voice.  The victim opened the door, and a fight ensued, causing a couch to shift and a glass to fall on the floor.  When Mejia-Rincon peeked from one of the two bedroom doors that opened into the living room, the fighting had stopped, and she saw a person "wearing all black" with "a black hat that covered the whole head" pointing an "old-fashioned gun" with a cylinder at the victim, who was standing against the wall.  After observing the two individuals "for less than a minute," Mejia-Rincon closed the bedroom door and heard people running, followed by two or three gunshots.  When Mejia-Rincon opened the second door to the bedroom, which provided a view of the entrance, she saw the man dressed in black with his head covered walk out of the apartment.  She noticed marks on the back of the shooter's neck, which appeared to be tattoos, but she was not wearing her eyeglasses.  Mejia-Rincon did not see

the victim. Mejia-Rincon testified that she thought the shooter might have been Brown but was not sure because she never saw the shooter's face. The incident "happened quick[ly]," in "a short time," over the course of "maybe like ten, fifteen minutes."

On the day of the shooting, at exactly noon, Amanda Compton, the victim's first-floor neighbor, heard a "bunch of noise," like people wrestling, followed by what sounded like a "herd of elephants" coming down the stairs. She did not recall hearing gunshots.

"[A] couple of minutes" after the defendant left her vehicle, Kelley heard approximately three gunshots. About one minute later, she observed the victim leave the apartment building, shirtless and bleeding from the chest, and "[dive] into what looked like bushes." Right after, the defendant also left the residence and got into the back seat of the vehicle, stating that his "life [was] over" because his deoxyribonucleic acid (DNA) would be in the victim's apartment. The defendant removed his T-shirt, and Kelley believed that the defendant had cut his hand, which is why he expressed concern that his DNA would be in the apartment. The defendant cried and said that the victim fought back, and that he did not want to kill the victim, but that the victim was going to die. On Brown's command, Kelley "peeled out" and left the area.

The victim's neighbor, Gary Laaksonen, arrived home from work and was outside at around 12:45 P.M.  From his front yard, about forty to fifty feet away, he observed a "bluish-gray" colored SUV parked across the street with two people in it -- a woman with reddish hair in a pulled back style in the driver's seat and a man with a shaved head in the front passenger's side. Laaksonen then saw his neighbor, the victim, who appeared to be scared, come out of his apartment building.  Approximately one to two minutes later, Laaksonen observed a second man leave the victim's apartment building, go to the vehicle parked across the street, enter by the rear passenger's side door, and say, "Let's go, let's get out of here."

c.  Aftermath of the shooting.  Kelley drove to a convenience store, where Brown instructed her to park behind the store so that they could "get rid of the guns."  He also ordered Kelley to clean blood from the back seat where the defendant had sat.  The defendant expressed concern that Kelley was a witness to the events surrounding the shooting, so Brown made her promise not to tell anyone.

The defendant, Brown, and Kelley then entered Tiffany Phillinger's apartment, which was in a building connected to the convenience store.  According to Phillinger, a friend of the defendant, the defendant and Brown arrived between 1 P.M. and 1:30 P.M.  The defendant and Brown were "fidgety," and the

defendant appeared nervous. She also noticed that the defendant had "a couple of spots of blood on his leg." The defendant used Phillinger's bathroom to shower, and Phillinger gave the defendant and Brown a change of clothes. They then went to the kitchen to listen to a police scanner to see whether anyone had reported Kelley's license plate. While listening to the scanner, Brown asked the defendant, "Why did you do that?" and the defendant responded, "What did you expect me to do? He was fighting me." A day or two later, the defendant telephoned Phillinger and told her to "say that he wasn't at [her] house" and "not to mention [his] name, or else."

At around 1:20 P.M., while still at the victim's residence, Mejia-Rincon telephoned two of the victim's friends and explained that she did not know where the victim had gone or what had happened to him.[5] The victim's two friends arrived within the next twenty minutes; they searched for the victim but could not locate him. After they "heard a lady scream" from outside, the three decided to stop their search and leave. They left the apartment before police arrived.

---

[5] On the day of the shooting, Nooks received a telephone call about the shooting from her brother, one of the victim's friends, who had helped search for the victim. Nooks then called Brown to ask him about what had happened; she testified that the call occurred between 11:30 A.M. and 12 P.M.

After the defendant and Brown cleaned up at Phillinger's apartment, the defendant left and went to Fruguglietti's mother's house. The defendant arrived there at around 2:30 P.M. He was upset, had tears in his eyes, a cut on his hand, and blood on his sneakers. The defendant told Fruguglietti that he had been in a fight, that he had "fucked up," and that he was sorry.

Francis drove the defendant and Fruguglietti back to Gardner. The defendant told Fruguglietti and Francis to provide him an alibi and to tell police that he was with them "from twelve to five" that day. The defendant told Francis that he had "messed up," that he had been "in a fight for his life," and that he had tried to rob someone, but it had gone wrong; he then asked her to bring his sneakers to her work and to get rid of them in the Dumpster. Francis complied.

Later that night, the defendant told Francis and Fruguglietti that he needed a ride the next morning, June 22, 2013, to meet a van that would bring him to New York City. He also told them that he was "sorry," and that his intent was to rob the victim, but "it went wrong." After being pressed by Fruguglietti, the defendant further explained what had occurred: he had knocked on the victim's door, pushed his way into the apartment, and pointed a gun at the victim when he realized the victim also had a gun. He then said that "they [had] got[ten]

in a physical fight, and that the gun [had gone] off a few times; and he [had] looked around for something to take out of the house, and he [had] seen a girl in the house, so he ran out." The defendant admitted that Brown told him the victim had drugs and money at his apartment, and "it was too good of an opportunity to pass up."

d. Police investigation. At 2:16 P.M., emergency medical workers and police officers responded to a telephone call from a neighbor indicating that there was a man in need of assistance; they found the victim's body on the rear porch of a building near his apartment building. A blood trail went from the victim's body, up some steps to a sidewalk and eventually to the front exterior stairs, the front porch, and through the interior stairs and hallway of the victim's apartment building, leading to his third-floor apartment. The medical examiner who performed the autopsy reported that the victim had two gunshot wounds and "two graze gunshot wounds." The victim also had abrasions on the side of his left abdomen, on the right side of his back, and on his right hip area; abrasions or scratches on both knees; and lacerations on his scalp and on the left side of his neck. The cause of death was determined to be a gunshot wound to the torso.

Inside the victim's apartment, police located three scales and a knife in the front bedroom, and two intertwined white T-

shirts with blood stains, a folding knife, and a .40 caliber Smith & Wesson semiautomatic pistol in the living room. In the kitchen, police observed a hole in the door trim to the pantry, wooden fragments on the kitchen table, a mark on the wall above the sink, a mark on the ceiling, and a projectile on the kitchen floor. Police did not recover any shell casings, which the Commonwealth's ballistics expert testified is consistent with shots fired from a revolver. He further opined that the projectile found in the kitchen, along with the two projectiles removed from the victim's body, could not have been fired by the firearm located in the victim's apartment. Based on the markings in the victim's kitchen and the spent projectiles, the ballistics expert concluded that the shots were fired from the front of the living room into the kitchen area.

On June 23, 2013, Kelley went to the Fitchburg police station and gave statements to police about the murder. When she arrived at the police station, Kelley gave the officers the keys to her vehicle and told them that evidence of the murder would be in her car.

Police searched the vehicle, finding blood stains at the back of the front passenger's seat "near the bottom of the arm-rest area," and in the rear passenger's seat toward the middle seats on both the seat back and seat bottom. The major male DNA profile obtained from the swab of the rear passenger's seat

matched the victim. The defendant, Brown, and the victim were excluded as the source of the major DNA profile from the swab of the back of the front passenger's seat.

On June 25, 2013, the defendant telephoned Fruguglietti and warned her "that the police were going to come to [her] house, and not to be stupid." A few minutes later, police arrived and brought Fruguglietti and Francis to the police station for questioning. Per the defendant's request, Fruguglietti and Francis both lied to police officers, telling them that the defendant had been with them from 12 P.M. to 5 P.M. on the day of the shooting.

Officers interviewed Francis again on July 9, during which she gave a statement that differed from her earlier interview when she said that she had been with the defendant on June 21 from 12 P.M. to 5 P.M. The defendant fled from Massachusetts, and he later was apprehended with Fruguglietti in Virginia on July 25.

e. Prior proceedings. In August 2013, a grand jury returned indictments charging the defendant with murder in the first degree, G. L. c. 265, § 1; home invasion, G. L. c. 265, § 18C; armed assault in a dwelling, G. L. c. 265, § 18A; armed assault with intent to rob, G. L. c. 265, § 18 (b); three counts of kidnapping, G. L. c. 265, § 26; possession of a firearm without a firearm identification (FID) card, as a career

criminal, G. L. c. 269, §§ 10 (h) (1), 10G (a); possession of ammunition without an FID card, as a career criminal, G. L. c. 269, §§ 10 (h) (1), 10G (a); unlawfully carrying a loaded firearm without a license, G. L. c. 269, § 10 (a), (n); and threatening to commit a crime, G. L. c. 275, § 2.

In January 2016, the defendant's joint trial with his codefendant, Dale, commenced and spanned two weeks. In February 2016, the jury convicted the defendant of murder in the first degree on the theory of felony-murder, in addition to all the remaining charges, except for the three kidnapping charges and threatening charge, on which he was acquitted. The defendant filed his notice of appeal soon thereafter, and the Commonwealth subsequently entered a nolle prosequi for the unlawful possession of ammunition charges.

The defendant's appeal was docketed in this court in 2018. The defendant then filed a motion to stay his appeal and a motion for a new trial, which was remanded to the Superior Court. The motion judge, who was not the trial judge, denied the defendant's motion for a new trial after a nonevidentiary hearing, and the defendant again appealed. We allowed the defendant's motion to consolidate his direct appeal with his appeal from the denial for his motion for a new trial.

2. Discussion. a. Ineffective assistance of counsel. The defendant argues that his trial counsel was ineffective for

failing to introduce three categories of telephone records, thereby depriving him of an otherwise available, substantial ground of defense, namely, that Brown was the shooter, while the defendant was at home in Gardner the entire time.

When reviewing a defendant's appeal from the denial of a motion for a new trial in conjunction with the direct appeal of a conviction of murder in the first degree, "we do not evaluate his ineffective assistance claim under the traditional standard set forth in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974)" (citation omitted). Commonwealth v. Melendez, 490 Mass. 648, 656-657 (2022). Instead, we apply the more favorable standard of G. L. c. 278, § 33E, and review the defendant's claim for a substantial likelihood of a miscarriage of justice. Id. at 657. Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C. 469 Mass. 447 (2014). Under this standard, "we first ask whether defense counsel committed an error in the course of trial," and if there was error, "we ask whether it was likely to have influenced the jury's conclusion." Commonwealth v. Ayala, 481 Mass. 46, 62 (2018), citing Commonwealth v. Seino, 479 Mass. 463, 472-473 (2018).

We conclude that any errors by trial counsel did not create a substantial likelihood of a miscarriage of justice. See Ayala, 481 Mass. at 62. Accordingly, the motion judge did not abuse her discretion in denying the defendant's motion for a new

trial.  See Commonwealth v. Hernandez, 481 Mass. 189, 195, cert. denied, 140 S. Ct. 168 (2019), quoting Commonwealth v. Phinney, 446 Mass. 155, 158 (2006), S.C., 448 Mass. 621 (2007) ("As the motion judge was not the trial judge, and as the motion judge conducted a nonevidentiary hearing, we are in 'as good a position as the motion judge to assess the trial record'" [footnote omitted]).

Trial counsel explained that the Commonwealth provided him with telephone records of various witnesses and involved parties prior to trial.  From what he could recall, he did not introduce the telephone records because it was unclear to whom the telephone numbers belonged or who was using the telephones at the relevant times.  Trial counsel nonetheless conceded that his decision not to introduce telephone records in furtherance of the defendant's alibi defense was an oversight; he did not know there were telephone records that could have supported the defendant's alibi or "defense in any way."

There are three categories of telephone records at issue: a 12:16 P.M. telephone call from the defendant's landline to Brown on the day of the shooting; Kelley's cell phone records between 11 A.M. and 1 P.M. on the day of the shooting, indicating her ability to access and use her cell phone; and Brown's cell phone records, specifically, a twenty-one minute

period of inactivity from 12:22 P.M. to 12:43 P.M. on the day of the shooting.  We analyze each in turn.

i.  Telephone call at 12:16 P.M.  The defendant argues that the 12:16 P.M. telephone was important alibi evidence; it would be impossible for the defendant to be the shooter, where multiple witnesses testified that the shooting occurred at or around noontime and where the telephone call proves he was still at his house in Gardner at that time.  The motion judge concluded this information was not material because, even if the defendant had made that telephone call, it was possible for him still to travel the distance between Gardner and Fitchburg and to commit the murder in the time frame described "by at least some of the witnesses."  We agree.

The witnesses provided varying testimony about when exactly the shooting occurred, which makes it difficult to discern a concrete timeline of events to support the defendant's theory that he could not have been in Fitchburg at the time of the shooting.  For instance, the victim's girlfriend, Mejia-Rincon, and the woman who was in the first-floor apartment on that day, Compton, both testified that the events occurred at noon. Laaksonen offered differing testimony, telling the jury that he saw the victim and an individual in pursuit of him leave the victim's residence at around 12:45 P.M.  Nooks recalled calling Brown to ask him about the shooting between 11:30 A.M. and

12 P.M., and one of the two friends who helped search for the victim received a telephone call from Mejia-Rincon at "around" 1:20 P.M. immediately after the shooting. According to Phillinger, the defendant and Brown arrived at her apartment between 1 P.M. and 1:30 P.M. Finally, emergency personnel responded to a dispatch at 2:16 P.M., and Fruguglietti and Francis both testified that the defendant arrived at Fruguglietti's mother's house at around 2:30 P.M. As the motion judge noted, all of the trial testimony "is consistent with the crucial events occurring between noon and 2 P.M., but beyond that, there are multiple differing estimates of the precise time of the shooting and surrounding circumstances."

Considering the timeline evidence in its totality, even if trial counsel had introduced the 12:16 P.M. telephone call at trial and were able to prove the defendant was the individual who made that call, it likely would have had little effect on the jury's verdicts. See Commonwealth v. Moore, 489 Mass. 735, 743-745 (2022) (no ineffective assistance of counsel where "cell phone records [did] not establish a different timeline from that developed at trial"). It cannot be said that trial counsel was ineffective where there is nothing that indicates "better work might have accomplished something material for the defense." Commonwealth v. Watt, 484 Mass. 742, 764 (2020), quoting Commonwealth v. Satterfield, 373 Mass. 109, 115 (1977).

Moreover, trial counsel elicited testimony to place the alibi defense in front of the jury. Fruguglietti testified that the defendant did not leave their apartment in Gardner until 12:10 P.M. Counsel highlighted this fact in his closing argument, stating that the defendant "at noontime on June 21, 2013, is in Gardner, twenty to thirty minutes away from [the victim's apartment]." Although introducing the 12:16 P.M. telephone call could have corroborated Fruguglietti's testimony, failure to introduce this evidence cannot be said to have resulted in a substantial likelihood of a miscarriage of justice. See Commonwealth v. Hensley, 454 Mass. 721, 736 (2009), citing Commonwealth v. Medeiros, 395 Mass. 336, 347 (1985) ("There is no requirement that trial counsel always present . . . documentary evidence to support an argument, especially where other evidence is presented to support it").

ii. Kelley's cell phone records. Next, the defendant argues that Kelley's cell phone records, showing that she was sending and receiving text messages and telephone calls between 11 A.M. and 1 P.M. on the day of the shooting, indicates that she did have access to her cell phone while she was held captive, despite testifying that she did not, significantly undermining her credibility as a witness. This argument is unavailing.

As an initial matter, "[e]ven [using] the more favorable standard of review under § 33E, a claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish." Commonwealth v. Fisher, 433 Mass. 340, 357 (2001). Further, both trial counsel and investigating officers explained that it was difficult to distinguish who was using which cell phone. A State police detective who investigated the victim's death testified that because there was "a lot of handing of cell phones back and forth," "there [was] no reliability as to who to associate, phone-to-number." Even if trial counsel introduced Kelley's cell phone records to attempt to show that she did have access to and used her cell phone while she was being held captive, the jury already had heard that the cell phone records were an unreliable means of determining who was actually making a given telephone call.

Trial counsel also diligently and thoroughly impeached Kelley by questioning her about her differing versions of events over time,[6] her drug use and her dependency on Brown as her drug dealer, and the benefits she received from the prosecution for testifying in the defendant's trial. Further impeachment of

_____

[6] At a prior hearing in this case, Kelley testified that Brown was the individual who went into the victim's building to attempt to rob the victim.

Kelley with her cell phone records likely would not have affected the jury's verdict in this case, where "it would have been cumulative of the ample information trial counsel already had available and used effectively." Watt, 484 Mass. at 764. See Fisher, 433 Mass. at 357 ("absent counsel's failure to pursue some obviously powerful form of impeachment available at trial, it is speculative to conclude that a different approach to impeachment would likely have affected the jury's conclusion").

iii. Brown's cell phone records. Finally, the defendant maintains that trial counsel was ineffective for failing to introduce Brown's cell phone records, which would have shown a twenty-one minute period of inactivity between 12:22 P.M. and 12:43 P.M. on the day of the shooting. He argues that this period of inactivity supports the theory that Brown was the one who shot the victim, and not the defendant.

We cannot say that introduction of these records would have influenced the jury verdict. See Ayala, 481 Mass. at 62. As the motion judge correctly noted, introduction of Brown's cell phone records could have hurt the defense, because they showed multiple telephone calls between the defendant and Brown on the day of the shooting. They also corroborated Kelley's and Fruguglietti's testimony that the defendant received a telephone call from Brown in the time leading up to the shooting.

Although the period of silence in Brown's telephone usage supported the defendant's theory that Brown was the shooter, it equally would have tied the defendant to Brown, where the Commonwealth's theory was the defendant participated in a joint venture to rob and kill the victim. The fact that Brown was not using his cell phone actively from 12:22 P.M. to 12:43 P.M. may have provided some support for the theory that Brown was the shooter, but those same records would have aided a theory that the defendant nonetheless was guilty of murder in the first degree as a joint venturer. Where introduction of the cell phone records had the simultaneous potential to incriminate and exculpate the defendant, there can be no substantial likelihood of a miscarriage of justice. See, e.g., Commonwealth v. Jacobs, 488 Mass. 597, 604 (2021) (counsel was not ineffective for failing to call witnesses where testimony "could cause more harm than good to the defense's case").

Given the overwhelming evidence of the defendant's guilt, we are confident that even if trial counsel had offered the telephone records, they would not have influenced the jury's conclusion that the defendant shot the victim. We discern no error in the judge's denial of the defendant's motion for a new trial on this basis.

b. Felony-murder merger doctrine. The defendant was convicted of felony-murder with the predicate felonies being

armed home invasion and armed assault in a dwelling. At oral argument before this court, the issue of merger arose surrounding the Commonwealth's reliance on these charges to serve as the predicates for the charge of felony-murder in the first degree. The parties were permitted to file supplemental briefing on this issue. In his supplemental filing, the defendant argues that the trial judge erred by failing to instruct the jury on the merger doctrine of felony-murder, where armed assault in a dwelling was the predicate offense. We agree that the trial judge should have instructed on merger, but it did not result in a substantial likelihood of a miscarriage of justice.

"The merger doctrine functions as a constraint on the application of the felony-murder rule by limiting the circumstances in which a felony may serve as the predicate for felony-murder." Commonwealth v. Fredette, 480 Mass. 75, 80 (2018).[7] Specifically, "the conduct which constitutes the felony must be separate from the acts of personal violence which constitute a necessary part of the homicide itself" (quotation and citation omitted). Commonwealth v. Gunter, 427 Mass. 259,

---

[7] As both the murder and the defendant's trial occurred before our decision in Commonwealth v. Brown, 477 Mass. 805, 807 (2017), cert. denied, 139 S. Ct. 54 (2018), we do not address the effect that that decision has on the ongoing vitality of the merger doctrine. See Fredette, 480 Mass. at 80 n.9.

272 (1998), S.C., 456 Mass. 1017 (2010) and 459 Mass. 480, cert. denied, 565 U.S. 868 (2011). The doctrine "ensures that not every assault that results in death will serve as a basis for murder in the first degree on the theory of felony-murder." Commonwealth v. Scott, 472 Mass. 815, 819 (2015).

In Fredette, we established a two-step framework to analyze whether a felony merges with a subsequent killing in cases that predate our decision in Commonwealth v. Brown, 477 Mass. 805 (2017), cert. denied, 139 S. Ct. 54 (2018). See Fredette, 480 Mass. at 81. The first step is to inquire whether, as a matter of law, the felony is capable of merger. See Commonwealth v. Phap Buth, 480 Mass. 113, 118 n.8, cert. denied, 139 S. Ct. 607 (2018). The second step is a factual inquiry; "[i]f merger is a possibility, it is for the jury to determine whether the felony that occurred was separate from the killing as a matter of fact." Id., citing Fredette, supra at 84.

i. Separate intent or purpose. A predicate felony is incapable of merger with the killing itself if it has "an intent or purpose separate and distinct from the act causing physical injury or death." Fredette, 480 Mass. at 81. Kidnapping, armed robbery, rape, and arson are examples of predicate felonies that are categorically incapable of merging with murder because they have an intent or purpose separate and distinct from the act of killing. See id. at 86 ("Because aggravated kidnapping involves

an intent independent from the killing, neither form of aggravated kidnapping implicates the merger doctrine"); Commonwealth v. Christian, 430 Mass. 552, 556 (2000) (armed robbery does not merge with killing because underlying purpose of armed robbery is to steal, which is independent of intent to harm victim); Commonwealth v. Wade, 428 Mass. 147, 153 (1998), S.C., 467 Mass. 496 (2014) and 475 Mass. 54 (2016) ("the intent to commit the rape, not the intent to inflict serious bodily harm, was the substitute for the malice requirement of murder"); Commonwealth v. Quigley, 391 Mass. 461, 466 (1984), cert. denied, 471 U.S. 1115 (1985) (for purposes of merger doctrine, "rape, arson, robbery and burglary are sufficiently independent of the homicide" [citation omitted]).  If this condition is satisfied, no further analysis is required.  Fredette, supra at 81.

Here, however, one of the potential predicate offenses was armed assault in a dwelling, which lacks "an independent felonious purpose from the intent to cause physical injury or death."  Fredette, 480 Mass. at 85.  See Gunter, 427 Mass. at 274-275 (there are circumstances "wherein armed assault in a dwelling is not a suitably independent felony to support a conviction of murder in the first degree").  Therefore, it was error for the trial judge not to instruct the jury on merger; it was for the jury to decide whether the conduct underlying the

felony was distinct from the act that caused the killing. See Phap Buth, 480 Mass. at 118. Because the defendant did not object at trial to the lack of instruction, we consider whether that error created a substantial likelihood of a miscarriage of justice. See id. at 119; Gunter, supra at 274.

ii. Independent acts. "If the underlying predicate felony does not have an independent felonious purpose, the court must then undertake a second step in the analysis, to determine whether the felony merges with the killing." Fredette, 480 Mass. at 84. We turn next to whether the predicate felony merged with the shooting as a matter of fact. See Phap Buth, 480 Mass. at 118 n.8. Armed assault in a dwelling "may serve as the predicate for felony-murder so long as the conduct that constitutes the armed assault (the underlying felony) is separate and distinct from the conduct necessary to kill the victim." Fredette, supra at 85, citing Commonwealth v. Kilburn, 438 Mass. 356, 358-359 (2003).

Here, the defendant argues that there was a single struggle between the defendant and the victim that resulted in the death of the victim thereby implicating the merger doctrine. We disagree. Testimony by Mejia-Rincon, who was present at the time of the shooting, in addition to Fruguglietti's testimony and evidence of the victim's injuries, support that there were at least two separate assaults of the victim.

Mejia-Rincon testified that there was a knock at the door, and when the victim opened the door, a fight ensued. After the fighting had ceased, Mejia-Rincon opened the bedroom door and looked out into the living room, where she saw the defendant pointing a gun at the victim, who was standing against the wall. After she closed the door again, she heard running and then two or three gun shots. Fruguglietti also testified at trial, recounting the defendant's version of events. The defendant told Fruguglietti that he knocked on the victim's door, pushed his way into the apartment, and proceeded to get into a physical fight with the victim. The gun then went off a few times. Mejia-Rincon testified that "[e]verything happened quick[ly]," in "a short time," over the course of "maybe like ten, fifteen minutes."

Based on the testimony given at trial there was at least one, and possibly two, assaults that occurred prior to the shots being fired that resulted in the death of the victim. First, the defendant told Fruguglietti that he pushed his way into the victim's apartment. Second, there also was a fight between the defendant and the victim and time between the "scuffle" and the shooting of the victim -- enough time that Mejia-Rincon closed the bedroom door and heard running. The defendant's and the victim's injuries also are consistent with an assault having occurred prior to the shooting. The defendant had a cut on his

hand from the victim "fighting" back, and the victim had multiple abrasions and lacerations on his abdomen, back, knees, neck, and head. The evidence was sufficient to establish that there were, at a minimum, two discrete assaults. See Scott, 472 Mass. at 823 (defendant's conviction of felony-murder in first degree with home invasion as predicate felony affirmed where defendant's struggle with victim at front door constituted first assault, and where gunshot killing victim, which occurred "right after," was second independent assault); Kilburn, 438 Mass. at 359 (no merger where person in home opened door, gunman committed first assault by entering, brandishing gun, and pushing victim backward, and after short interlude, gunman then shot victim, committing second act). Contrast Commonwealth v. Stokes, 460 Mass. 311, 314 & n.8 (2011) (armed home invasion could not serve as predicate felony because act of pointing gun at victim in course of shooting him was not sufficiently separate from shooting itself). It is not dispositive that the shooting occurred within a short period of time after the defendant entered the victim's apartment. See Scott, supra at 824 (fact that entry into residence and shooting "occurred within a matter of seconds" was not fatal to merger analysis).

In sum, the trial judge should have instructed the jury on merger where the predicate felony for felony-murder was armed assault in a dwelling, and there was only one victim. See Model

Jury Instructions on Homicide 63 (2018) (merger instruction required "where [1] the underlying felony contains an element of assault and [2] the underlying felony, by its nature, does not have an intent or purpose separate and distinct from the act causing physical injury or death").  Nevertheless, given the evidence at trial, the jury could have found beyond a reasonable doubt that the defendant committed at least two distinct assaults on the victim; the lack of instruction did not result in a substantial likelihood of a miscarriage of justice.  See Phap Buth, 480 Mass. at 120, citing Gunter, 427 Mass. at 274.

c.  Armed assault with intent to rob.  The defendant argues that his conviction of armed assault with intent to rob must be vacated as duplicative of his conviction of armed assault in a dwelling where the predicate felony for felony-murder was armed assault in a dwelling, and the armed assault with intent to rob served as the "fourth element" for armed assault in a dwelling. Specifically, the defendant's argument is that, because the Commonwealth had to prove that the defendant had the specific intent to commit an armed assault with intent to rob, his convictions of both armed assault in a dwelling and armed assault with intent to rob are duplicative.  Unpacking this nested argument requires a review of the elements of both armed assault in a dwelling and armed assault with intent to rob.

At trial, the judge correctly instructed the jury that to convict the defendant of armed assault in a dwelling, as the predicate offense for felony-murder, the Commonwealth must prove beyond a reasonable doubt that "(1) the defendant entered a dwelling that was not his own while armed with a dangerous weapon; (2) the defendant assaulted another inside the dwelling; and (3) the assault was committed with the intent to commit a felony." Commonwealth v. Negron, 462 Mass. 102, 109 (2012), citing G. L. c. 265, § 18A. To convict an individual of armed assault with intent to rob, the Commonwealth must prove that the defendant (1) was armed with a dangerous weapon; (2) assaulted a person; and (3) had a specific or actual intent to rob the person assaulted. Commonwealth v. Rivera, 445 Mass. 119, 130 n.15 (2005), citing G. L. c. 265, § 18.

The defendant argues that the actions were related so closely that the verdicts are duplicative, citing Commonwealth v. Santos, 440 Mass. 281, 293 (2003), in support of this proposition. Our decision in Santos was overruled by our decision in Commonwealth v. Anderson, 461 Mass. 616, 632-633, cert. denied, 568 U.S. 946 (2012), where we explicitly rejected the closely related conduct-based approach except where one crime is a lesser included offense of the other or where there are multiple counts of the same offense. See id., quoting Commonwealth v. Vick, 454 Mass. 418, 431 (2009) ("elements-based

approach remains the standard for determining whether multiple convictions stemming from one criminal transaction are duplicative").  Because here we do not have multiple counts of the same offense and armed assault with intent to rob is not a lesser included offense of armed assault in a dwelling, we apply the traditional same elements test.  See Vick, supra, citing Morey v. Commonwealth, 108 Mass. 433, 434 (1871).  "[A] defendant may be properly punished for two crimes arising out of the same course of conduct provided that each crime requires proof of an element that the other does not."  Vick, supra, quoting Commonwealth v. Valliere, 437 Mass. 366, 371 (2002).

The defendant's argument that these two convictions are duplicative fails because armed assault in a dwelling and armed assault with intent to rob both require proof of an element that the other does not -- entry into a dwelling while armed with a dangerous weapon and an intent to rob the person assaulted, respectively.  While we recognize that the defendant's conviction of armed assault in a dwelling rested on proof of the defendant's specific intent to commit a robbery, "we consider only the elements of the crimes, not the facts to be proved or the evidence adduced to prove them."  Vick, 454 Mass. at 431, quoting Commonwealth v. Cabrera, 449 Mass. 825, 827 (2007).  See Commonwealth v. Jones, 441 Mass. 73, 76 (2004) ("the elements of the crimes charged are considered objectively, abstracted from

the facts [of the case]" [citation omitted]).  For the purposes of our application of the same elements test involving a conviction of armed assault in a dwelling, we do not consider the felony that the defendant intended to commit.  See People v. Miller, 498 Mich. 13, 19 (2015) (under legal elements test, "two offenses will only be considered the 'same offense' where it is impossible to commit the greater offense without also committing the lesser offense").  We therefore affirm the defendant's conviction of armed assault with intent to rob.

    d.  _Joint venture jury instructions_.  The defendant further argues that a new trial is warranted because the judge erroneously instructed the jury on joint venture liability and allowed the jury to return a general verdict without requiring the jury to specify whether the defendant was guilty under principal liability or joint venture liability.  At trial, the defendant objected to the jury instructions on joint venture, so we review the judge's instructions for prejudicial error.  See Commonwealth v. Murphy, 442 Mass. 485, 508-509 (2004).  He did not otherwise object to the verdict slip used, so we review any error with respect to the verdict slip for a substantial likelihood of a miscarriage of justice.  See Wright, 411 Mass. at 681.

    The trial judge informed the jury that "the Commonwealth claims that [the defendant] acted individually or as a joint

venturer with . . . Brown in committing the offenses of murder, armed assault in a dwelling, armed assault with intent to rob, home invasion, and the firearm[s] charges." He then instructed the jury on joint venture in accordance with the then current Model Jury Instructions on Homicide 16 (2013) and our opinion in Commonwealth v. Zanetti, 454 Mass. 449, 470 (2009) (Appendix).

The defendant argues that the jury instructions on joint venture were erroneous because it was possible, based on the instruction given, that the jury convicted him of merely being present at the time of the shooting. There was no error in the trial judge's joint venture instructions. He stated:

> "Mere presence at the scene of the crime is not enough to find a defendant guilty. Presence alone does not establish a defendant's knowing participation in the crime, even if a person knew about the intended crime in advance and took no steps to prevent it. To find a defendant guilty, there must be proof that the defendant intentionally participated in some fashion in committing that particular crime and had or shared the intent required to commit the crime. It is not enough to show that the defendant simply was present when the crime was committed, or that she knew about it in advance."

The instructions adequately informed the jury that the Commonwealth must prove more than mere presence to convict the defendant. See Zanetti, 454 Mass. at 470 (Appendix).[8]

---

[8] The defendant requests that we reconsider our holding Zanetti, 454 Mass. 449 (establishing modified test and jury instructions on joint venture). We decline to do so. See Commonwealth v. Miller, 486 Mass. 78, 94 n.6 (2020).

Nor did the judge err in supplying a general verdict slip to the jury. In Zanetti, 454 Mass. at 466-467, we issued the following guidance for trial judges when instructing the jury on joint venture liability:

"(1) instruct the jury that the defendant is guilty if the Commonwealth has proved beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, alone or with others, with the intent required for that offense; (2) continue to permit the trial judge to furnish the jury with a general verdict even when there is differing evidence that the defendant committed the crime as a principal or as an accomplice; and (3) on conviction, examine whether the evidence is sufficient to permit a rational juror to conclude beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime."

Id. Thus, the Commonwealth "need not establish a defendant's precise role in the crime, i.e., whether the defendant acted as a principal or accomplice," Commonwealth v. Bonner, 489 Mass. 269, 277 (2022), only that the defendant knowingly participated in the commission of the crime charged with the required criminal intent. See Commonwealth v. Watson, 487 Mass. 156, 162 (2021), citing Zanetti, supra at 467. The defendant concedes that there was sufficient evidence of his involvement in the shooting as either a joint venturer or a principal. There is no basis, therefore, to grant a new trial on these grounds.

e. Defendant's firearms convictions. The defendant requests that we vacate his convictions of unlawful possession of a firearm and unlawful possession of a loaded firearm in

light of our recent decision in Guardado, 491 Mass. 666. In that case, we held that the due process clause and the Second Amendment to the United States Constitution require the Commonwealth to bear the burden of disproving that a defendant had a license to possess a firearm when prosecuting a defendant for unlawful possession of a firearm, and the jury instructions must relay this burden. Id. at 692-693. Where the jury is not instructed on this burden, and where there is no record evidence on the lack of license, the defendant is entitled to vacatur of the conviction. See id. at 692-694. The holding in that case applies prospectively "and to those cases that were active or pending on direct review as of the date of the issuance of [New York State Rifle & Pistol Ass'n v. Bruen, 142 S. Ct. 2111 (2022)]." Id. at 694. As the defendant's direct appeal was pending at the time of the issuance of Bruen on June 23, 2022, he is entitled to the benefit of our decision in Guardado.

The trial judge's jury instruction on the charge of unlawful possession of a firearm was as follows:

> "In order to prove the defendant guilty of [unlawful possession of a firearm], the Commonwealth must prove three things beyond a reasonable doubt: first, that the defendant possessed an item; second, that the item meets the legal definition of 'firearm'; and third, that the defendant knew that he possessed that firearm."

There was no instruction that required the Commonwealth to disprove that the defendant had a license to possess a firearm.

Further, after a review of the record, evidence of the defendant's lack of license never was introduced at trial. Thus, the defendant's conviction of unlawful possession of a firearm must be vacated. Because unlawful possession of a loaded firearm under G. L. c. 269, § 10 (n), "is not an independent charge but, rather, 'constitute[s] further punishment of a defendant who also [has] been convicted under G. L. c. 269, § 10 (a),'" the defendant's conviction of unlawful possession of a loaded firearm also must be vacated. See Guardado, 491 Mass. at 670 n.4, quoting Commonwealth v. Tate, 490 Mass. 501, 520 (2022).

f. Review under G. L. c. 278, § 33E. Pursuant to our duty under G. L. c. 278, § 33E, we have conducted a thorough review of the entire record and discern no basis upon which to exercise our extraordinary authority to order a new trial or to reduce the verdicts.

3. Conclusion. The defendant's convictions of murder in the first degree, home invasion, and armed assault with intent to rob, and the order denying his motion for a new trial, are affirmed. The conviction of armed assault in a dwelling is vacated, and the charge shall be dismissed. The convictions of

unlawful possession of a firearm and unlawful possession of a loaded firearm are also vacated.[9]

So ordered.

---

[9] The issue whether retrial shall be permitted on the firearms convictions vacated pursuant to Guardado, 491 Mass. 666, is currently pending before this court and is scheduled for oral argument in September 2023.  See Commonwealth vs. Guardado, No. SJC-13315.  The rescript in this opinion shall be stayed pending our decision in that case.